WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Attorneys for the Initial Debtor and*
*Proposed Attorneys for the Subsidiary Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                                :

In re                              :        **Chapter 11**
                                :

**EVERGREEN GARDENS MEZZ LLC,** *et al.*,  :     **Case No. 21-10335 (MG)**
                                :

          **Debtors.**[1]        :     **(Joint Administration Pending)**
                                :

------------------------------------------------------------X

## MOTION OF DEBTORS FOR ENTRY OF
## INTERIM AND FINAL ORDERS (I) AUTHORIZING SUBSIDIARY
## DEBTORS TO (A) PAY CERTAIN CRITICAL OPERATING EXPENSE CLAIMS,
## AND (B) HONOR TENANT OBLIGATIONS; AND (II) GRANTING RELATED RELIEF

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

        Evergreen Gardens Mezz LLC ("**EGM**" or the "**Initial Debtor**"), together with

Evergreen Gardens I LLC ("**EG I**") and Evergreen Gardens II LLC ("**EG II**" and, together with

EG I, the "**Subsidiary Debtors**" and, together with the Initial Debtor, the "**Debtors**"), as debtors

and debtors in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"),

respectfully represent as follows in support of this motion (the "**Motion**"):

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Evergreen Gardens Mezz LLC (0416); Evergreen Gardens I LLC (2211); and Evergreen Gardens II LLC (6782). The Debtors' principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

## Relief Requested

1.    By this Motion, pursuant to sections 363(b) and 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**"), the Debtors request entry of interim and final orders (i) authorizing, but not directing, the Subsidiary Debtors to (a) pay the prepetition claims of certain vendors, suppliers, service providers, and other similar entities (the "**Critical Vendors**" and the prepetition claims of the Critical Vendors, the "**Critical Operating Expense Claims**") that are essential to maintaining the operations of the Denizen (as defined below) and the going concern value of the Subsidiary Debtors' businesses, and (b) to continue to honor and perform their obligations under the leases with tenants of the Denizen, including, without limitation, to continue honoring obligations relating to tenant security deposits (the "**Tenant Obligations**"), and (ii) granting related relief.

2.    A chart outlining the representative categories and approximate amounts of the Critical Operating Expense Claims that the Subsidiary Debtors are seeking authority to pay pursuant to this Motion on an interim and final basis is set forth below.  The Series E Noteholders and the Mezzanine Lender (each as defined below) have consented to the relief requested herein and to the payment of the Critical Operating Expense Claims, subject to and in accordance with the terms of the orders approving the Subsidiary Debtors' use of cash collateral and debtor-in-possession financing (the "**Financing Documents and Orders**").

2

| Critical Vendor Category | Approx. Amount Seeking Authority to Pay on Interim Basis | Approx. Amount Seeking Authority to Pay on Final Basis |
|---|---|---|
| Management Company | $100,430 | $100,430 |
| Building Staff | $174,402 | $174,402 |
| Other Critical Vendors | $41,290 | $41,290 |
| **Total Estimated Critical Operating Expense Claims:** | **$316,122** | **$316,122** |

3.     The Subsidiary Debtors are seeking to pay certain prepetition obligations owed to the Critical Vendors encompassed in these categories because they are essential to the ongoing day-to-day operations of the Denizen.  As set forth in greater detail below, each of these Critical Vendors performs essential services at both the Denizen X and Denizen Y (each as defined below), but are paid by either EG I or EG II, respectively, in accordance with where such services are performed.  Of the total $316,122 the Subsidiary Debtors in Critical Operating Expense Claims that the Subsidiary Debtors are seeking interim and final authority to pay, $163,750 is owed by EG I and $152,372 is owed by EG II.  No Critical Operating Expense Claims of EG I will be paid by EG II or vice versa.

4.     Notably, as set forth in the *Declaration of Asaf Ravid Pursuant to Local Bankruptcy Rule 1007-2 in Support of Subsidiary Debtors' Chapter 11 Petitions and Related Relief*, sworn to on the date hereof (the "**Ravid Declaration**"), which has been filed with the Court contemporaneously herewith and is incorporated herein by reference,[2] all creditors of EG I are expected to be paid in full with EG I's sale proceeds and unimpaired under the Subsidiary Debtors' proposed chapter 11 plan that has been filed contemporaneously hereto (as may be amended, modified, or supplemented from time to time, in accordance with the RSA, and together with all

---

[2]     Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Ravid Declaration.

3

schedules and exhibits thereto, the "**Plan**").  Accordingly, approval of such amounts merely accelerates the timing of payments of the Critical Operating Expense Claims against EG I and not the treatment of such claims.  With respect to the Critical Operating Expense Claims against EG II, the Subsidiary Debtors believe that the payment of such claims is necessary to avoid a substantial disruption to the Denizen's day-to-day operations given the joint operation of the Denizen X and Denizen Y.

5.      If the Subsidiary Debtors are not authorized to pay these Critical Operating Expense Claims and the Critical Vendors refuse to continue providing their respective services, the Subsidiary Debtors' risk immediate and irreparable harm to their estates because, in essence, the Denizen's day-to-day operations will come to a standstill.  Accordingly, the Subsidiary Debtors believe that the relief requested herein is in the best interests of their estates and stakeholders.

6.      A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**").

### Jurisdiction

7.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

8.      On February 22, 2021 (the "**Initial Debtor Petition Date**"), the Initial Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  On the date hereof (the "**Subsidiary Debtor Petition Date**" and, together with the Initial Debtor Petition Date, the "**Petition Dates**"), the Subsidiary Debtors commenced their own voluntary cases

4

under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.  Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

9.      Following a robust and comprehensive marketing process, the Debtors have secured the support and commitment, pursuant to an executed restructuring support agreement, dated August 31, 2021 (the "**RSA**"), of their senior, secured noteholders and mezzanine lender. These two key creditor constituencies support, pursuant to the RSA, a value-maximizing chapter 11 plan that implements a sale of substantially all of the Subsidiary Debtors' assets to an affiliate of Atlas Capital Group, LLC for approximately $506 million pursuant to the terms of a signed purchase and sale agreement (the "**Purchase Agreement**").  Prior to the date hereof, in accordance with applicable securities laws, the Subsidiary Debtors commenced the process of soliciting votes from creditors in each of their impaired voting classes under the proposed Plan, which has already been overwhelmingly approved by the holders of the Subsidiary Debtors' senior secured notes.  Subject to completion of the ongoing voting process, the Debtors expect the chapter 11 plan to be accepted by all classes of impaired voting creditors.  Consistent with their obligations under the RSA and the Purchase Agreement, the Debtors intend to promptly seek a joint hearing from the Court to consider the adequacy of their disclosure statement and confirmation of their proposed chapter 11 plan and to proceed promptly to closing on the proposed sale transaction.

10. Information regarding the Subsidiary Debtors' business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the Ravid Declaration.

### The Subsidiary Debtors' Businesses and the Critical Vendors

11. The Subsidiary Debtors own a newly completed, 911-unit, residential complex located on two adjacent parcels of real property in Brooklyn, New York, known as 123 Melrose Street (the "**Denizen X**") and 54 Noll Street (the "**Denizen Y**" and, together, with the Denizen X, the "**Denizen**"). The Denizen is situated around an approximately 17,850 square foot courtyard and contains abundant greenspace, as well as a public park and promenade. Although the Denizen X and Denizen Y are two distinct buildings with separate ownership, the Denizen is operated as a single residential complex with shared facilities. Common operation of the Denizen provides residents with access to the multitude of unique amenities located in both the Denizen X and Denizen Y. These amenities include an indoor pool, game room, dog park and spa, on-site beer brewery, café with co-working space, curated art gallery, game room, bowling lounge, rooftop gardens, community chef's kitchen, and fitness center with a rock-climbing wall, boxing ring, and spin studio. The Subsidiary Debtors believe that these shared residential amenities play a significant role in attracting prospective residents and retaining current residents, thereby making the Denizen a more desirable property and enhancing its value.

12. The Management Company. The Denizen's day-to-day operations are managed by Smart Management NY Inc. (the "**Management Company**"), an unaffiliated third-party entity.[3] The Management Company is responsible for leasing and lease-related

---

[3] The Subsidiary Debtors' day-to-day operations were previously overseen by All Year Management, Inc., which was an affiliate of All Year Holdings and partially owned by Mr. Yoel Goldman, the sole economic shareholder of All Year Holdings Limited, and a third party. Since that time, the day-to-day operations have been

activities, rent collection, payment processing, staffing, selecting vendors and service providers, general building maintenance, the payment of operating expenses, maintaining the Subsidiary Debtors' books and records, and otherwise overseeing and managing the day-to-day operations of the Denizen on the Subsidiary Debtors' behalf.  To make payments for operating expenses and to return tenants' security deposits, the Management Company accesses the Subsidiary Debtors' respective operating accounts and, once approval is obtained, remits payment on their behalf.  This process is central to ensuring that the Denizen operates efficiently and seamlessly.

13.    The Subsidiary Debtors pay approximately $100,430 per month—$51,480 by EG I and $48,950 by EG II—for the Management Company's services.  As of the date hereof, it is estimated that EG I owes approximately $51,480 and EG II owes approximately $48,950 to the Management Company relating to the period prior to the Subsidiary Debtor Petition Date.

14.    <u>The Building Staff</u>.  As set forth in the Ravid Declaration, the Subsidiary Debtors have no employees.  The approximately twenty-two (22) building staff members at the Denizen are employed pursuant to two (2) separate agreements (the "**Staffing Agreements**") with PBS Facility Services Inc. (collectively, with its affiliates, the "**Building Staff Provider**").  One of these agreements is with Services Employees International Union 32BJ, and the parties to that agreement are "PBS Facility Services, Inc., Platinum Amenity Services and Dynamic Building Services".  The other agreement is with Local 713 (a union), and the party to that agreement is "Dynamic Building Services."

---

transitioned to the Management Company (Smart Management NY, Inc.), which, to the best of their knowledge and belief, has no affiliation with Mr. Goldman.  Although the applicable contracts have not been updated to reflect the change in management, the Subsidiary Debtors pay a monthly fee to the unaffiliated Management Company.  Mr. Goldman is not involved in the management of the Denizen, and, to the best of their knowledge and belief, the Subsidiary Debtors do not pay funds to any entitled affiliated with Mr. Goldman in connection with the operations of the Subsidiary Debtors.

15.    Pursuant to the Staffing Agreements, the Subsidiary Debtors pay a total monthly fee of approximately $251,383 as reimbursement for staff wages and salaries.  Of this amount, approximately $119,383 is paid by EG I and approximately $132,000 is paid by EG II. As of the date hereof, it is estimated that EG I owes approximately $234,955 and EG II owes approximately $85,540 to the Building Staff Provider for accrued and unpaid amounts.

16.    <u>Other Critical Vendors</u>.  To perform its responsibilities and to keep the Denizen running efficiently and seamlessly, the Management Company relies on certain vendors and service providers who perform essential services related to the Denizen's operations and amenities.  The Management Company pays these vendors and service providers, as well as other operational expenses, on the Subsidiary Debtors' behalf and through each of their respective operating accounts.  In some instances, if the Subsidiary Debtors were required to suddenly change service providers, it would require a significant amount of time, capital, and other resources to locate qualified replacements (to the extent such replacements exist).  As of the date hereof, it is estimated that EG I owes approximately $21,887 and EG II owes approximately $22,680 to these other Critical Vendors on account of amounts relating to the period prior to the Subsidiary Debtor Petition Date.

17.    Prior to the date hereof, the Subsidiary Debtors and their professional advisors spent considerable time and effort (a) identifying those vendors and service providers that may be "critical" to the Denizen's day-to-day operations and (b) determining the appropriate amounts to pay such vendors and service providers.  As a result of these efforts, the Subsidiary Debtors determined, in their sound business judgment, that the Critical Vendors are "critical" because (i) they provide services that are essential to the Denizen's ongoing day-to-day operations

and (ii) cannot be replaced in a cost-efficient manner or without causing significant disruption to the Denizen's day-to-day operations.

**The Critical Vendor Cap and Payment Protocol**

18.    As set forth in the chart above, the Subsidiary Debtors are seeking authority to pay Critical Operating Expense Claims (or to direct the Management Company to pay such claims on behalf of the Subsidiary Debtors) owed by EG I and EG II not to exceed $163,750 and $152,372, respectively, for a total of $316,122 (the "**Vendor Cap Amount**").  To the best of their knowledge and belief, the total amount of the Vendor Cap Amount will become due and payable prior to the date of a final hearing on the Motion.

19.    The Subsidiary Debtors propose to pay a Critical Operating Expense Claim to the extent that the related Critical Vendor agrees to continue to supply goods or services to the Subsidiary Debtors on "Customary Trade Terms" for the duration of the Chapter 11 Cases.  As used herein, "Customary Trade Terms" means industry trade terms and existing contractual obligations between the parties, including rebates and discounts, and shall in no event be worse than the most favorable terms and credit limits in effect within the two (2) years before the Subsidiary Debtor Petition Date, or such other trade terms as agreed by the Subsidiary Debtors and the Critical Vendor.  However, if the Subsidiary Debtors are unable to negotiate continued supply of essential services upon Customary Trade Terms, the Subsidiary Debtors seek authority, based on their business judgment, to pay Critical Vendors all or a portion of their Critical Operating Expense Claim in return for the continued supply of such services (even if not on the Customary Trade Terms).

20.    To ensure that Critical Vendors continue business with the Subsidiary Debtors on Customary Trade Terms, the Subsidiary Debtors propose that they be authorized to

9

require as a condition to paying any Critical Operating Expense Claim that any Critical Vendor execute a letter agreement, substantially in the form of the letter annexed hereto as **Exhibit 1** to the Proposed Interim Order (each a "**Vendor Agreement**").

21.      Additionally, certain of the Critical Vendors may possess mechanics' liens, possessory liens, or similar state law trade liens (the "**Trade Liens**") on the Subsidiary Debtors' assets based upon the Critical Operating Expense Claims.  The Subsidiary Debtors propose that, as a further condition to receiving payment of a Critical Operating Expense Claim, a Critical Vendor must agree to take all necessary actions to remove any such Trade Lien at the Critical Vendor's sole expense.  The Subsidiary Debtors further propose that if a Critical Vendor fails to comply with the terms and provisions of the Vendor Agreement or such other terms as were individually agreed to between the Subsidiary Debtors and such Critical Vendor, then the Subsidiary Debtors may, in their discretion, and without further order of the Court, declare that: (i) the payment of the Critical Operating Expense Claim, as the case may be, is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Subsidiary Debtors may recover from the Critical Vendor in cash or in goods (including by setoff against postpetition obligations); or (ii) the Critical Vendor shall immediately return the Subsidiary Debtors' payment of its Critical Operating Expense Claim without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever, and the Critical Operating Expense Claim shall be reinstated in an amount that will restore the Subsidiary Debtors and the Critical Vendor to their original positions as if the Vendor Agreement had never been entered into and the payment of the Critical Operating Expense Claim had not been made.

22.      The Subsidiary Debtors propose to maintain a matrix summarizing (i) the name of each Critical Vendor paid; (ii) the amount paid to each Critical Vendor on account of its

Critical Operating Expense Claim; and (iii) the type of goods or services provided by that Critical Vendor. This matrix will be provided (i) upon request, to the U.S. Trustee and (ii) on a weekly basis (or such other agreed upon time period), to counsel for the Series E Notes Trustee and the Mezzanine Lender, and the professionals retained by any official committee of unsecured creditors appointed in these Chapter 11 Cases; *provided that* the professionals for any such committee shall keep the matrix confidential and shall not disclose any of the information in the matrix to anyone, including, but not limited to, any member of any statutory committee of creditors, without prior written consent of the Subsidiary Debtors.

### Tenant Obligations

23.    As previously described, the Management Company is responsible for leasing and lease-related administration at the Denizen on behalf of the Subsidiary Debtors. Among other things, the Management Company's is responsible for, on behalf of the Subsidiary Debtors, the collection and return of tenants' security deposits and honoring any other Tenant Obligations. As set forth in the Ravid Declaration, the Subsidiary Debtors are required to collect security deposits and maintain them in separate escrow accounts with Capital One, N.A. in accordance with applicable law. The Management Company is also responsible for returning the tenants' security deposits in accordance with the terms of the tenant's respective leases and applicable law. To avoid any disruption to the operations of the Debtors and the continued administration of tenant leases at the Denizen, the Subsidiary Debtors request authority to continue to honor and perform any Tenant Obligations under their leases, including to continue honoring tenants' security deposits on behalf of the Subsidiary Debtors through the pendency of these Chapter 11 Cases.

**Relief Requested Should Be Granted**

24.     The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Under section 363 of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims if a sound business purpose exists for doing so.  *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (finding that there must be a sound business justification to justify payment of certain claims); *Armstrong World Indus., Inc. v. James A. Phillips, Inc.* (*In re James A. Phillips, Inc.*), 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on section 363 of the Bankruptcy Code to allow contractor to pay prepetition claims of suppliers).  The business judgment rule is satisfied where "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *See, e.g.*, *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  Moreover, if "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citations omitted).  Courts in this District consistently have declined to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and have upheld a board's decisions as long as such decisions are attributable to any "rational business purpose."  *Integrated*, 147 B.R. at 656 (quoting *CRTF Corp. v. Federated Dep't Stores*, 683 F. Supp. 422, 436 (S.D.N.Y. 1988)).

25.    In addition, the Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein, because such relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105.  Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession" to act as a fiduciary to "protect and preserve the estate, including an operating business' going-concern value," on behalf of the debtor's creditors and other parties in interest.  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 233 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee.").  Payment of prepetition claims is authorized under section 105(a) of the Bankruptcy Code and the doctrine of necessity when such payment is essential to the continued operation of a debtor's business.  *See, e.g.*, *In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996); *In re Fin. News Network Inc.*, 134 B.R. 732, 735–36 (Bankr. S.D.N.Y. 1991); *CoServ*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use Section 105(a) of the Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate."); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for payment of prepetition claims under the doctrine of necessity and noting that the bankruptcy court has "power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11").

13

26.    As set forth above, the Subsidiary Debtors have determined, in the exercise of their sound business judgment, that authorizing them to pay Critical Operating Expense Claims and to honor the Tenant Obligations (or directing the Management Company to honor or pay such obligations on behalf of the Subsidiary Debtors) is not only essential to avoid significant disruption to the Denizen's day-to-day operations, but also necessary to ensure that the value of their business as a going concern is preserved through the pendency of these Chapter 11 Cases.  If the Subsidiary Debtors are not permitted to pay the Critical Operating Expense Claims, and if the vendors and service providers cease providing their services, the Denizen's day-to-day operations will essentially come to an immediate halt.  It is vital that the Denizen's day-to-day operations continue uninterrupted so as to avoid the immediate and irreparable harm that the Subsidiary Debtors' estates, their creditors, and the tenants of the Denizen would surely suffer if a significant operational disruption were to occur.

27.    The Subsidiary Debtors are mindful of their fiduciary obligations to preserve and maximize the value of their estates.  Therefore, the Subsidiary Debtors have determined, in their sound business judgment, that it is critical that they have the authority and discretion to pay the Critical Operating Expense Claims.  The Subsidiary Debtors believe that doing so is essential to avoid significant disruption to Denizen's operations and corresponding immediate and irreparable harm to the Subsidiary Debtors and their estates.

28.    In addition, as the Court is aware, the success of these Chapter 11 Cases is premised on implementing a sale of the Denizen to the Purchaser pursuant to the Plan.  The Subsidiary Debtors are required under the Purchase Agreement to "manage and, subject to Section 9.1.3, lease the Properties or will cause the Properties to be managed and, subject to Section 9.1.3, leased under policies substantially similar to those existing prior to the date

14

hereof…" (Purchase Agreement, § 9.1.1.)  Failure to pay amounts owed to the Critical Vendors could result in a serious disruption to the management and operations of the Denizen, which could jeopardize the sale to Purchaser.  Accordingly, the relief requested herein is necessary and appropriate.

29.    Furthermore, as set forth above, with respect to Critical Operating Expense Claims owed by EG I, which is a solvent debtor case with all creditors and interest holders to be unimpaired and paid in full in accordance with the Bankruptcy Code and otherwise applicable law, the Subsidiary Debtors are merely seeking authority to alter the timing and not the treatment or priority of the Critical Operating Expense Claims.  With respect to the Critical Operating Expense Claims owed by EG II, the Subsidiary Debtors, in their sound business judgment, have determined that paying such claims is necessary to ensure that the Denizen's day-to-day operations are not disrupted given the common operation of the buildings.  Finally, as set forth above, the Series E Noteholders and the Mezzanine Lender—two of the Debtors' key creditor constituencies—have consented to the relief requested herein, subject to the interim and final caps set forth above and subject in all respects to the terms of the Financing Orders

30.    The Subsidiary Debtors submit that without the authority to permit them to pay Critical Operating Expense Claims and to honor the Tenant Obligations, the Subsidiary Debtors could not preserve the value of their estates.  The relief requested herein is targeted to ensure the Subsidiary Debtors maximize the value of their estates for the benefit of all parties in interest.

## **Reservation of Rights**

31.    Nothing contained herein is intended, or shall be construed, as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any

15

appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

### The Debtors Satisfy Bankruptcy Rule 6003(b)

32.    Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty-one (21) days after the Subsidiary Debtor Petition Date.  Fed. R. Bankr. P. 6003(b).  As described in detail above,  the Critical Vendors provide "critical" services that cannot be replaced in a cost-efficient manner or without significant disruption to the Denizen's day-to-day operations.  Further, honoring the Tenant Obligations will help ensure that the tenants' receive their security deposits without delay. If the Subsidiary Debtors do not receive the authority to pay the Critical Operating Expense Claims and to honor the Tenant Obligations, the Denizen's day-to-day operations will be significantly disrupted, which will frustrate the Subsidiary Debtors' ability to preserve and maximize the value of their estates and jeopardize the sale to Purchaser, thereby causing immediate and irreparable harm to the Subsidiary Debtors and their estates.  Accordingly, the Subsidiary Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## Bankruptcy Rules 6004(a) and (h)

33.     To implement the foregoing successfully, the Subsidiary Debtors request

that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the

circumstances, and waive the fourteen (14) day stay of an order authorizing the use, sale, or lease

of property under Bankruptcy Rule 6004(h).  As explained in the Ravid Declaration, the relief

requested herein is critical to the Subsidiary Debtors' efforts to preserve and maximize the value

of their estates.  To obtain maximum value of their estates and minimize administrative expenses,

the Subsidiary Debtors must be able to proceed quickly.  Accordingly, the Subsidiary Debtors

submit that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and that a

waiver of the 14-day stay period is appropriate under Bankruptcy Rule 6004(h), to the extent such

notice requirements and such stay apply.

## Notice

34.     Notice of this Motion will be provided to (i) William K. Harrington, the

U.S. Department of Justice, Office of the U.S. Trustee, 201 Varick Street, Room 1006, New York,

NY 10014 (Attn: Andrea B. Schwartz, Esq. and Shara Cornell, Esq.); (ii) the Debtors' top twenty

(20) unsecured creditors; (iii) the Internal Revenue Service; (iv) the United States Attorney's

Office for the Southern District of New York; (v) counsel to Mishmeret Trust Company Ltd., as

Trustee for the Bondholders, Chapman & Cutler LLP, 1270  Sixth Avenue, New York, New York

10020 (Attn: Michael Friedman, Esq., Stephen R. Tetro II, Esq., and Aaron Krieger, Esq.); (vi)

counsel to MREF REIT Lender 9 LLC, as Mezzanine Lender,  Goodwin Procter LLP, The New

York Times Building, 620 Eighth Avenue, New York, New York 10018 (Attn: Michael H.

Goldstein, Esq., and Kizzy L. Jarashow, Esq.); (vii)  counsel to JPMorgan Chase Bank, N.A., as

Mortgage Lender to EG I, Fried, Frank, Harris, Shriver & Jacobson LLP, 1 New York Plaza, New

York, NY 10004 (Attn: Gary Kaplan, Esq. and Michael Barker, Esq.); and (viii) counsel to Atlas

Capital Group, LLC, as Purchaser, Thompson Hine LLP, 335 Madison Avenue, 12th Floor, New

York, New York 10017 (Attn: John Bae, Esq. and Jonathan Hawkins, Esq.) (collectively,

the "**Notice Parties**").  The Debtors respectfully submit that no further notice is required.

35.     No previous request for the relief sought herein has been made by the

Subsidiary Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of the proposed interim and

final orders granting the relief requested herein and such other and further relief as the Court may

deem just and appropriate.

Dated:  September 14, 2021
        New York, New York

/s/  Matthew P. Goren
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Attorneys for the Initial Debtor and*
*Proposed Attorneys for the Subsidiary Debtors*

18

## Exhibit A

## Proposed Interim Order

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X
                                       :

In re                               :        **Chapter 11**

                               :

**EVERGREEN GARDENS MEZZ LLC,** *et al.,*   :        **Case No. 21-10335 (MG)**

                               :

           Debtors.[1]          :        **(Joint Administration Pending)**

                               :

----------------------------------------------------------------X

### INTERIM ORDER (I) AUTHORIZING SUBSIDIARY DEBTORS TO (A) PAY CERTAIN CRITICAL OPERATING EXPENSE CLAIMS, AND (B) HONOR TENANT OBLIGATIONS; AND (II) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**"),[2] dated September 14, 2021 [ECF No. [___]], of

Evergreen Gardens Mezz LLC ("**EGM**" or the "**Initial Debtor**"), together with Evergreen

Gardens I LLC ("**EG I**") and Evergreen Gardens II LLC ("**EG II**" and, together with EG I, the

"**Subsidiary Debtors**" and, together with the Initial Debtor, the "**Debtors**"), as debtors and

debtors in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), pursuant

to sections 363(b) and 105(a) of the title 11 of the United States Code (the "**Bankruptcy Code**"),

Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"),

and Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local**

**Bankruptcy Rules**") for entry of interim and final orders (i) authorizing, but not directing, the

Subsidiary Debtors to (a) pay the prepetition claims of certain vendors, suppliers, service

providers, and other similar entities (the "**Critical Vendors**" and the prepetition claims of the

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Evergreen Gardens Mezz LLC (0416); Evergreen Gardens I LLC (2211); and Evergreen Gardens II LLC (6782). The Debtors' principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

Critical Vendors, the "**Critical Operating Expense Claims**") that are essential to maintaining the operations of the Denizen and the going concern value of the Subsidiary Debtors' businesses, and (b) to continue to honor and perform their obligations under the leases with tenants of the Denizen, including, without limitation, to continue honoring obligations relating to tenant security deposits (the "**Tenant Obligations**"), and (ii)   granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and due and proper notice of the relief requested in the Motion having been provided to the Notice Parties, such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and the Court having held a hearing to consider the relief requested in the Motion on an interim basis (the "**Hearing**"); and upon the Ravid Declaration, filed contemporaneously with the Motion, and the record of the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Subsidiary Debtors and their estates as contemplated by Bankruptcy Rule 6003, and is in the best interests of the Subsidiary Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**

1.    The Motion is granted on an interim basis to the extent set forth herein.

2

2.      Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Subsidiary Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay some or all of the Critical Operating Expense Claims (or to direct the Management Company to pay such amounts on behalf of the Subsidiary Debtors) in a manner consistent with their prepetition practices up to the Vendor Cap Amount.

3.      Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Subsidiary Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to continue to honor and pay Tenant Obligations (or to direct the Management Company to pay such amounts on behalf of the Subsidiary Debtors) during the Chapter 11 Cases.

4.      The Subsidiary Debtors shall undertake all appropriate efforts to cause Critical Vendors to enter into an agreement (the "**Vendor Agreement**") with the Subsidiary Debtors, substantially in the form of the agreement annexed hereto as **Exhibit 1**, upon "Customary Trade Terms."  As used herein, "Customary Trade Terms" means industry trade terms and existing contractual obligations between the parties, including rebates and discounts, and shall in no event be worse than the most favorable terms and credit limits in effect within the two (2) years before the Subsidiary Debtor Petition Date, or such other trade terms as agreed by the Subsidiary Debtors and the Critical Vendor.

5.      The Subsidiary Debtors are authorized, but not required, to enter into Vendor Agreements when the Subsidiary Debtors determine, in the exercise of their reasonable business judgment, that it is appropriate to do so; *provided that* the Subsidiary Debtors' inability to enter into a Vendor Agreement shall not preclude them from paying a Critical Operating

3

Expense Claim when, in the exercise of their reasonable business judgment, such payment is necessary to preserve the going concern value of the Subsidiary Debtors.

6.       As a condition to receiving payment of a Critical Operating Expense Claim, a Critical Vendor must agree to take all necessary actions to remove any such Trade Lien at the Critical Vendor's sole expense to the extent such Critical Vendor holds a Trade Lien on account of such Critical Operating Expense Claim.

7.       If a Critical Vendor has received payment of its Critical Operating Expense Claim and later refuses to continue supplying goods or services for the applicable period in compliance with the Vendor Agreement, this Interim Order, or such terms as were individually agreed to between the Subsidiary Debtors and such Critical Vendor, the Subsidiary Debtors may, in their discretion, declare that (i) the payment of the Critical Operating Expense  Claim is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Subsidiary Debtors may recover in cash or in goods from such Critical Vendor (including by setoff against postpetition obligations); or (ii) the Critical Vendor shall immediately return the payment of its Critical Operating Expense Claim without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever, and the Critical Operating Expense Claim shall be reinstated in such an amount so as to restore the Debtors and the Critical Vendor to their original positions as if the Vendor Agreement had never been entered into and no payment of the Critical Operating Expense Claim had been made.

8.       The Subsidiary Debtors shall maintain a matrix summarizing (i) the name of each Critical Vendor paid; (ii) the amount paid to each vendor for its Critical Operating Expense Claim; and (iii) the type of goods or services provided by each Critical Vendor.  This matrix shall

4

be provided (a) upon request, to the U.S. Trustee, and (b) on a weekly basis (or such other agreed upon time period), to counsel for the Series E Note Trustee and the Mezzanine Lender, and any professionals retained by any statutory committee of unsecured creditors appointed in these chapter 11 cases; *provided that* the professionals for any statutory committee of creditors shall keep the matrix confidential and shall not disclose any of the information in the matrix to anyone, including, but not limited to, any member of any statutory committee of creditors, without prior written consent of the Subsidiary Debtors.

9.      Notwithstanding anything to the contrary contained herein, (i) any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the Subsidiary Debtors under their postpetition financing agreements (the "**DIP Documents**") and any orders approving the DIP Documents and governing the Subsidiary Debtors' use of cash collateral (including with respect to any budgets governing or relating thereto) and (ii) to the extent there is any inconsistency between the terms of such orders approving the DIP Documents or the Subsidiary Debtors' use of cash collateral and any action taken or proposed to be taken hereunder, the terms of such orders approving the DIP Documents and use of cash collateral shall control.

10.     Nothing in the Motion or this Interim Order shall be deemed to authorize the Subsidiary Debtors to accelerate any payments not otherwise due prior to the date of the hearing to consider entry of an order granting the relief requested in the Motion on a final basis (the "**Final Hearing**").

11.     Applicable banks and financial institutions are authorized, but not directed, at the Subsidiary Debtors' request, to receive, process, honor and pay, to the extent of funds on deposit, any and all checks issued or to be issued or electronic fund transfers requested or to be

5

requested by the Management Company, on the Subsidiary Debtors' behalf, relating to the Critical Operating Expenses and the Tenant Obligations.

12.     The Final Hearing on the Motion shall be held **on _____, 2021, at ____.m. (Prevailing Eastern Time)** and any objections or responses to the Motion shall be in writing, filed with the Court, and served upon (i) the attorneys for the Initial Debtor and the proposed attorneys for the Subsidiary Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Gary T. Holtzer and Matthew P. Goren); and (ii) the Notice Parties, in each case so as to be received no later than **____.m. (Prevailing Eastern Time) on _____, 2021**.

13.     Nothing contained in the Motion or this Interim Order, nor any payment made pursuant to the authority granted by this Interim Order, is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors, (iii) a waiver of any claims or causes of action which may exist against any creditor or interest holder, or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

14.     Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

15.     Under the circumstances of theses Chapter 11 Cases, the requirements of Bankruptcy Rule 6003 are satisfied.

6

16.     Under the circumstances of these Chapter 11 Cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

17.     Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

18.     The Subsidiary Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order.

19.     The Court shall retain jurisdiction to hear and determine all maters arising from or related to the implementation, interpretation, and/or enforcement of this Interim Order.

Dated: _____, 2021
        New York, New York

        _____
        HONORABLE MARTIN GLENN
        UNITED STATES BANKRUPTCY JUDGE

7

## <u>Exhibit 1</u>

**Form of Vendor Agreement**

### Vendor Agreement

The Subsidiary Debtors (as defined below) and **[_____]** ("**Vendor**") hereby enter into the following vendor agreement (this "**Vendor Agreement**") dated as of this **[___], 2021**.

### Recitals

WHEREAS, on [●], 2021 (the "**Subsidiary Debtor Petition Date**"), Evergreen Gardens I LLC ("**EG I**") and Evergreen Gardens II LLC ("**EG II**" and, together with EG I, "**Subsidiary Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Court**").

WHEREAS, on [●], 2021, the Court entered the *Interim Order (I) Authorizing Subsidiary Debtors to (A) Pay Certain Critical Operating Expense Claims, and (B) Honor Tenant Obligations; and (II) Granting Related Relief* (ECF No. [●]) (the "**Critical Vendor Order**") authorizing the Debtors, under certain conditions, to pay the prepetition claims of certain vendors, including Vendor, subject to the terms and conditions set forth therein.

WHEREAS, pursuant to the Critical Vendor Order, to receive payment on account of prepetition claims, each Critical Vendor (as defined in the Critical Vendor Order) must agree to continue to supply goods or services to the Debtors on "Customary Trade Terms." As used herein and in the Critical Vendor Order, "Customary Trade Terms" means industry trade terms and existing contractual obligations between the Parties, including rebates and discounts, and shall in no event be worse than the most favorable terms and credit limits in effect within the two (2) years before the Subsidiary Debtor Petition Date, or such other trade terms as agreed by the Subsidiary Debtors and the Critical Vendor.

WHEREAS, the Subsidiary Debtors and Vendor (collectively, the "**Parties**") agree to the following terms as a condition of payment on account of certain prepetition claims Vendor may hold against the Subsidiary Debtors.

## Agreement

1.      The Parties hereby agree that Vendor is a "Critical Vendor" (as defined in the Critical Vendor Order).

2.      The balance of Vendor's aggregate prepetition claim(s) against the Debtors is $[__] (the "**Agreed Critical Operating Expense Claim**").

3.      Following execution of this Vendor Agreement, the Debtors will pay Vendor $[__] (the "**Payment Amount**") in full satisfaction of the Agreed Critical Operating Expense Claim. The Payment Amount will be paid pursuant to the Customary Trade Terms set forth below, and will be applied to any invoices previously received by the Debtors on account of the Agreed Critical Operating Expense Claim.

4.      For a period from the date this Vendor Agreement is executed until the earlier of (a) the effective date of a chapter 11 plan for the Debtors and (b) two (2) years from the date of this Vendor Agreement, Vendor shall supply goods **[and/or]** services to the Debtors based on the following Customary Trade Terms: _____.

5.      The Parties further agree, acknowledge and represent that:

      a.      the Parties have reviewed the terms and provisions of the Critical Vendor Order and consent to be bound by such terms and that this Vendor Agreement is expressly subject to the Critical Vendor Order;

      b.      any payments made on account of the Agreed Critical Operating Expense Claim shall be subject to the terms and conditions of the Critical Vendor Order, including any orders of the Court granting the relief requested in the Critical Vendor Order on a final basis, as applicable;

2

c.    if Vendor refuses to supply goods or services to the Debtors as provided herein or otherwise fails to perform any of their obligations hereunder, the Subsidiary Debtors may exercise all rights and remedies available under the Critical Vendor Order, the Bankruptcy Code, or applicable law;

d.    Vendor will not separately seek payment for any claims pursuant to section 503(b)(9) of the Bankruptcy Code or other similar claims outside of the terms of the Critical Vendor Order or this Vendor Agreement unless Vendor's participation in the vendor payment program authorized by the Critical Vendor Order is terminated;

e.    in consideration for receiving the Payment Amount, Vendor shall not file or otherwise assert against the Subsidiary Debtors, their estates, or any other person or entity, or any of their respective assets or property (real or personal) any lien (regardless of the statute or other legal authority upon which the lien is asserted) related to any remaining prepetition amounts allegedly owed to Vendor by the Subsidiary Debtors arising from agreements entered into before the Commencement Date. Furthermore, if Vendor has taken steps to file or assert a lien before entering into this Vendor Agreement, Vendor agrees to take all necessary steps to remove the lien as soon as possible at its sole cost and expense;

f.    if Vendor fails to comply with the terms and provisions of this Vendor Agreement, the Subsidiary Debtors may, in their discretion, and without further order of the Bankruptcy Court, declare (i) the payment of the Payment Amount, as the case may be, is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Subsidiary Debtors may recover from the Vendor in cash or in goods (including by setoff against postpetition obligations); or (ii) the Vendor shall immediately return the Subsidiary Debtors' payment of its Payment Amount without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever, and the Critical Operating Expense Claim (as defined in the Critical Vendor Order) shall be reinstated in an amount that will restore the Subsidiary Debtors and the Critical Vendor to their original positions as if the Vendor Agreement had never been entered into and the payment of the Critical Operating Expense Claim had not been made;

g.    if Vendor fails to comply with the terms and provisions of this Vendor Agreement, the Subsidiary Debtors may, in their discretion, declare that such Vendor Agreement has terminated; provided that the Vendor Agreement may be reinstated if:

    i.    after notice and a hearing (following a motion filed by the respective Critical Vendor), the Bankruptcy Court reverses the Subsidiary

3

Debtors' decision to terminate the Vendor Agreement for good cause shown that the Subsidiary Debtors' determination was materially incorrect;

ii.     the Critical Vendor fully cures the underlying default of the Vendor Agreement within five (5) business days from the date of receipt of notice of termination of the Vendor Agreement; or

iii.    the Subsidiary Debtors, in their sole discretion, reach a commercially acceptable agreement with the breaching party;

h.     the Parties hereby submit to the exclusive jurisdiction of the Court to resolve any dispute arising under or in connection with this Vendor Agreement.

6.     Subject to the requirements of the Bankruptcy Code, further orders of the Court, or applicable law, and unless it otherwise becomes public without a breach of this Vendor Agreement, Vendor agrees to hold in confidence and not disclose to any party:  (a) any and all payments made by the Subsidiary Debtors pursuant to this Vendor Agreement; (b) the terms of payment set forth herein;  and  (c) the Customary Trade Terms (collectively, the "**Confidential Information**"); provided that if any party seeks to compel Vendor's disclosure of any or all of the Confidential Information, through judicial action or otherwise, or Vendor intends to disclose any or all of the Confidential Information, Vendor shall immediately provide the Subsidiary Debtors with prompt written notice so that the Subsidiary Debtors may seek an injunction, protective order or any other available remedy to prevent such disclosure; provided, further, that if such remedy is not obtained, Vendor shall furnish only such information as Vendor is legally required to provide.

7.     The undersigned hereby represent and warrant that:  (a) they have full authority to execute this Vendor Agreement on behalf of the respective Parties; (b) the respective Parties have full knowledge of, and have consented to, this Vendor Agreement; and (c) they are fully authorized to bind the Party to all of the terms and conditions of this Vendor Agreement.

4

8.      This Vendor Agreement sets forth the entire understanding of the Parties regarding the subject matter hereof and supersedes all prior oral or written agreements between them.  This Vendor Agreement may not be changed, modified, amended or supplemented, except in a writing signed by both Parties.

9.      This Vendor Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.  Signatures by facsimile or electronic signatures shall count as original signatures for all purposes.

AGREED AND ACCEPTED AS OF THE DATE SET FORTH ABOVE:

**[SUBSIDIARY DEBTOR]**                          **[VENDOR]**

_____          _____

5