WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Attorneys for the Initial Debtor and*
*Proposed Attorneys for the Subsidiary Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
|  |  :  |  |
| **In re** | : | **Chapter 11** |
|  | : |  |
| **EVERGREEN GARDENS MEZZ LLC,** *et al.*, | : | **Case No. 21-10335 (MG)** |
|  | : |  |
| **Debtors.**[1] | : | **(Joint Administration Pending)** |
|  | : |  |

---------------------------------------------------------------X

**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a),
363, AND 503(b) AND FED. R. BANKR. P. 2002, 6003, 6004, AND
9014 FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
AND APPROVING BID PROTECTIONS AND (II) GRANTING RELATED RELIEF**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

　　　　　　Evergreen Gardens Mezz LLC ("**EGM**" or the "**Initial Debtor**"), together with

Evergreen Gardens I LLC ("**EG I**") and Evergreen Gardens II LLC ("**EG II**" and, together with

EG I, the "**Subsidiary Debtors**" and, together with the Initial Debtor, the "**Debtors**"), as debtors

and debtors in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"),

respectfully represent as follows in support of this motion (the "**Motion**"):

---

[1]　　The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Evergreen Gardens Mezz LLC (0416); Evergreen Gardens I LLC (2211); and Evergreen Gardens II LLC (6782). The Debtors' principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

**Preliminary Statement**

1.     Following months of extensive negotiations with stakeholders and the completion of a robust and comprehensive marketing process, the Subsidiary Debtors have commenced these Chapter 11 Cases to implement a sale (the "**Sale**") of substantially all of their assets to ACI VI Denizen, LLC, an affiliate of Atlas Capital Group, LLC (collectively, "**Atlas**" or the "**Purchaser**"), pursuant to the terms of a signed purchase and sale agreement, dated August 2, 2021 (as amended by that certain first amendment, dated August 19, 2021, that certain second amendment, dated September 1, 2021, and as may be further modified, amended, or supplemented from time to time, and together with all schedules and exhibits thereto, the "**Purchase Agreement**").    The Sale is the cornerstone of the Subsidiary Debtors' Chapter 11 Cases and provides for the purchase of two adjacent parcels of real property in Brooklyn, New York, known as 123 Melrose Street (the "**Denizen X**") and 54 Noll Street (the "**Denizen Y**" and, together, with the Denizen X, the "**Denizen**"), for total cash consideration of $506 million, as well as the assumption of certain of the Subsidiary Debtors' liabilities and the retention of all employees without interruption, each as set forth in the Purchase Agreement.  The Sale is to be implemented pursuant to the proposed joint chapter 11 plan for the Debtors (as may be amended, modified, or supplemented from time to time and together with all schedules and exhibits thereto, the "**Plan**"), filed contemporaneously hereto, and is supported by the Debtors' senior, secured noteholders (the "**Series E Noteholders**") and mezzanine lender (the "**Mezzanine Lender**")—two of the Debtors' key creditor constituencies—pursuant to an executed restructuring support agreement (as may be amended, modified, or supplemented from time to time, and together with any schedules or exhibits thereto, the "**RSA**").

2

2.      As described in greater detail below, the robust and comprehensive prepetition marketing process for the sale of the Denizen was led by the Subsidiary Debtors, with the assistance of professionals at Meridian Investment Sales, a segment of Meridian Capital Group, LLC (collectively, "**Meridian**").  Meridian, on behalf of the Subsidiary Debtors, devoted months to marketing the sale of the Denizen and soliciting bids from over 2,000 prospective buyers, including, but not limited to, private investors, institutions, pension funds, family offices, and REITs.  The culmination of this process resulted in the Subsidiary Debtors' selection of the Atlas Bid (as defined below), which represented the only viable and actionable bid from a credible purchaser capable of consummating an efficient and timely sale transaction for the Denizen at a purchase price that the Subsidiary Debtors believed to be fair and reasonable.  Accordingly, having adequately tested the market for a sale transaction for the Denizen, the Subsidiary Debtors have determined, in the exercise of their sound business judgement, that the best opportunity to consummate a value-maximizing transaction is to proceed with the Sale to the Purchaser pursuant to the Purchase Agreement.

3.      Given the wide reach of the prepetition marketing process, the certainty provided by the Purchase Agreement, and the commitment of the Debtors' key creditor constituencies to support the Sale to Atlas as set forth in the RSA, the Subsidiary Debtors do not intend to continue their marketing efforts on a postpetition basis.  Prior to the date hereof, in accordance with applicable securities laws, the Subsidiary Debtors commenced the process of soliciting votes from creditors in each of their impaired voting classes under the proposed Plan, which has already been overwhelmingly approved by the Series E Noteholders.  Subject to completion of the ongoing voting process, the Debtors expect the Plan to be accepted by all classes

of impaired voting creditors.  Consistent with their obligations under the RSA and the Purchase Agreement, the Debtors are seeking a joint hearing from the Court to consider the adequacy of their disclosure statement and confirmation of their proposed Plan and intend to proceed promptly to closing the proposed Sale to Atlas.

4.        Critically, the Purchase Agreement provides the Subsidiary Debtors with a "fiduciary out" should the Subsidiary Debtors determine, in the exercise of their fiduciary duties, to proceed with an alternative transaction.  Accordingly, (i) to set a floor for any proposed alternative transaction, (ii) to secure the Purchaser's firm commitment to the Sale contemplated by the Purchase Agreement, and (iii) to compensate the Purchaser for the substantial benefits the Subsidiary Debtors' estates will receive from such floor and commitment, the Subsidiary Debtors are seeking authorization and approval of the Bid Protections (as defined below), including the Break-Up Fee and Expense Reimbursement (each as defined below).  The Bid Protections represent a material inducement for, and were a condition of, the Purchaser's firm commitment to proceed with the Sale pursuant to the Purchase Agreement.  The Subsidiary Debtors believe that providing the Purchaser with the Bid Protections is reasonable, is a prudent exercise of their sound business judgment, and will facilitate a value-maximizing transaction for the benefit of the Debtors' stakeholders.

## **Relief Requested**

5.        By this Motion, pursuant to sections 105(a), 363, and 503(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9014-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**"), the

4

Subsidiary Debtors request entry of interim and final orders (i) authorizing and approving the Bid Protections in accordance with the terms and conditions set forth in the Purchase Agreement, and (ii) granting related relief.

6.    A proposed form of interim order granting the relief requested herein is annexed hereto as **Exhibit A** (the "**Proposed Bid Protections Order**").  In support of the Motion, the Subsidiary Debtors submit the declarations of (i) Helen Hwang, a Senior Executive Managing Director of Meridian Investment Sales, annexed hereto as **Exhibit B** (the "**Hwang Declaration**"), and (ii) Jeffrey R. Manning, Sr., a Managing Director at CohnReznick Capital Market Securities, LLC, annexed hereto as **Exhibit C** (the "**Manning Declaration**," and, together with the Hwang Declaration, the "**Declarations**").

7.    Contemporaneously hereto, the Subsidiary Debtors have filed a motion requesting an interim hearing on the Motion on shortened notice pursuant to Bankruptcy Rules 2002(a)(2) and 9006(c) and Local Bankruptcy Rule 9006-1(b).

### Jurisdiction

8.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. § 1408 and 1409.

### Background

9.    On February 22, 2021 (the "**Initial Debtor Petition Date**"), the Initial Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. On the date hereof (the "**Subsidiary Debtor Petition Date**" and, together with the Initial Debtor

Petition Date, the "**Petition Dates**"), the Subsidiary Debtors commenced their own voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.  Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

10.    Information regarding the Subsidiary Debtors' business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Asaf Ravid Pursuant to Local Bankruptcy Rule 1007-2 in Support of Subsidiary Debtors' Chapter 11 Petitions and Related Relief*, sworn to on the date hereof (the "**Ravid Declaration**"), which has been filed with the Court contemporaneously herewith and is incorporated herein by reference.[2]

### Prepetition Marketing and Sale Process

11.    In February 2021, the Subsidiary Debtors engaged Meridian, one of the nation's leading real estate finance advisory firms, to serve as the exclusive sales broker for the marketing and sale of the Denizen.  The Subsidiary Debtors, in consultation with Meridian, determined that marketing the Denizen X and Denizen Y for sale as part of a single transaction would yield maximum value because it would avoid many potential legal and operational challenges resulting from the separate ownership of the two parcels.  Accordingly, on

---

[2]    Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Ravid Declaration.

February 25, 2021, Meridian commenced a robust and comprehensive marketing and sale process

for the Denizen (the "**Marketing and Sale Process**").  The Subsidiary Debtors and Meridian

worked to ensure that the Marketing and Sale Process was broad, transparent, inclusive, efficient,

and value-maximizing.

12.    Meridian initially contacted over 2,000 prospective buyers, including, but

not limited to, private investors, institutions, pension funds, family offices, and REITs.  As a result

of these efforts, approximately 142 investor groups executed confidentiality agreements and

approximately twenty-nine (29) investor groups toured the Denizen.  To enhance and facilitate the

Marketing and Sale Process, on or around March 4, 2021, Meridian established a virtual data room

and due diligence library (the "**Data Room**") comprised of various materials and proprietary

information, including, but not limited to, an offering memorandum, historical operating

statements, service contracts, and information regarding staffing, payroll, and real estate taxes.

Each of the approximately 142 investor groups that executed confidentiality agreements were

provided access to the Data Room.

13.    Following an adequate due diligence and review period, the Subsidiary

Debtors, through Meridian, requested that investor groups submit first round bids by April 6, 2021.

The Subsidiary Debtors received fifteen (15)—five (5) written and ten (10) verbal—first round

bids (collectively, the "**First Round Bids**"), with the last written bid received near the end of

April 2021.  The Subsidiary Debtors, in consultation with Meridian, evaluated each of the First

Round Bids, focusing on several criteria, including, but not limited to: (i) initial proposed purchase

price; (ii) ability to increase the initial proposed purchase price; (iii) flexibility as to the general

deal terms; (iv) willingness to waive a due diligence period or ability to complete all due diligence

prior to executing a purchase and sale agreement; and (v) the willingness to enter into a purchase and sale agreement with a hard, non-refundable deposit.  Based on this review, the Subsidiary Debtors, in consultation with Meridian, invited six (6) investor groups to participate in the second round of the Marketing and Sale Process.

14.    Each of the six (6) investor groups that participated in the second round were provided with the Subsidiary Debtors' proposed form of purchase and sale agreement and encouraged to provide comments thereto.  Each of the investor groups was also granted access to additional materials contained in the Data Room to support refinement of their bids.  Additionally, each of the investor groups was requested to provide detailed information about their potential equity partners in order to confirm capability to close a potential sale transaction.  Where an investor group identified a potential equity partner, Meridian interviewed said partner to ascertain detailed financial information and identify any potential contingencies.  The investor groups were requested to submit second round bids by May 24, 2021.

15.    At the conclusion of the second round, four (4) bids were submitted by the participating investor groups (collectively, the "**Second Round Bids**"), including the bid submitted by Atlas (the "**Atlas Bid**").  The Subsidiary Debtors, in consultation with Meridian, thoroughly reviewed each of the four (4) Second Round Bids, focusing on, among other things: (i) whether the applicable bidder had a committed equity partner; (ii) the proposed purchase price; (iii) diligence contingencies; and (iv) the general deal terms.  Based on this criteria and review, for several reasons, it was clear to the Subsidiary Debtors, in their business judgement, that the Atlas Bid was the only credible and actionable Second Round Bid.  First, Atlas had already raised the equity necessary to close a transaction for the Denizen and its principals had the complete

discretion and full authority from their equity source to move forward with the transaction. Two (2) of the three (3) other Second Round Bids were unable to identify a credible source of the equity necessary to close a transaction for the Denizen.[3]  Second, no additional diligence was required and thus Atlas' deposit would become non-refundable upon execution of a purchase and sale agreement.  Aside from the Atlas Bid, each of the other Second Round Bids contained due diligence contingencies, including, among other things, requiring a minimum of thirty (30) days to conduct additional due diligence.  Third, the Atlas Bid's only contingency was that the transaction would need to be consummated pursuant to a chapter 11 plan of reorganization in order to, among other things, deliver Atlas clean title at closing.  Fourth, it was the only Second Round Bid that was accompanied by a concise list of key business issues to the proposed form of purchase and sale agreement.

16.      In essence, the Atlas Bid represented the only truly credible and actionable bid, proposed a purchase price the Subsidiary Debtors deemed, in their business judgment, fair and reasonable, and was submitted by a sophisticated potential purchaser committed to and capable of moving forward with a complex transaction in an efficient and timely manner.  The other Second Round Bids did not provide the certainty, credibility, and efficiency necessary to consummate a value-maximizing transaction.  Accordingly, the Subsidiary Debtors decided to proceed with the Atlas Bid because, in their sound business judgment, it provided the best opportunity to consummate a value-maximizing transaction.  Therefore, on or around June 23, 2021, the Subsidiary Debtors and the Purchaser began negotiating the remainder of the purchase and sale

---

[3]      The one (1) Second Round Bid that was able to identify a credible equity source proposed a structured transaction at a lower purchase price than that proposed in the Atlas Bid.

agreement.  Notably, while negotiations were underway, the other investor groups continued to have access to the Data Room and were permitted to continue their due diligence, but none came forward with a revised or more certain bid.  Accordingly, following an extensive negotiation period between and among the Subsidiary Debtors, the Purchaser, and two of the Subsidiary Debtors' key creditor constituencies (the Mezzanine Lender and the Series E Noteholders), the Purchase Agreement was executed on August 2, 2021.

17.     Following execution of the Purchase Agreement, the Debtors, the Mezzanine Lender, and the Series E Notes Trustee commenced extensive, good-faith negotiations that ultimately culminated in the execution of the RSA.  During this period, the Purchaser (who had already funded its initial $2.5 million deposit) agreed to several amendments to the Purchase Agreement to extend the timeframe and related milestones for commencement of these Chapter 11 Cases to allow the parties time to continue the discussions that ultimately allowed for the successful negotiation and execution of the RSA.

### The Purchase Agreement and Bid Protections[4]

18.     The Purchase Agreement represents a binding contract for the sale of the Denizen X and Denizen Y, including the buildings erected thereon, any and all other fixtures and improvements erected thereon, all fixtures and equipment attached or appurtenant thereto and the interest of the landlord in the Leases (as defined in the Purchase Agreement), all air and development rights appurtenant to the land, and (to the extent assignable), all permits and licenses

---

[4]    All capitalized terms set forth in this section shall have the meanings ascribed to them in the Purchase Agreement unless otherwise defined herein.  In the event of any inconsistencies between the provisions of the Purchase Agreement and the general description of such agreement set forth in this Motion, the Declarations, or the Proposed Bid Protections Order, the Purchase Agreement shall control.

held solely for use in connection with the land or improvements (collectively, the "**Property**" or "**Properties**"), for total consideration of (a) cash in the amount of $506 million, subject to certain adjustments and prorations under the Purchase Agreement and (b) Purchaser's assumption of certain liabilities and obligations of the Subsidiary Debtors (or as otherwise related to the Property) as set forth more fully in the Purchase Agreement.

19.     The Purchase Agreement includes various customary representations, warranties, and covenants by and from the parties, as well as certain conditions to closing the contemplated transaction and rights of termination related to the Subsidiary Debtors' Chapter 11 Cases.  The transactions contemplated by the Purchase Agreement are subject to approval by the Court and entry of an order implementing the Sale of the Property.

20.     Importantly, Purchaser has agreed to retain all Employees pursuant to and in accordance with their present terms of employment such that their employment will continue uninterrupted without loss of seniority, compensation, benefits or employment subject to the Union Agreements (as defined in the Purchase Agreement) and applicable law.  Purchaser shall effectuate the foregoing by, among other things, either directly executing agreements with the Employees' current employers or by retaining a management company or agent to execute such agreements.

21.     The following chart summarizes certain of the material terms in the Purchase Agreement:

| MATERIAL TERMS OF PURCHASE AGREEMENT | |
|---|---|
| **Acquired Assets;**<br>**Transferred Contracts;**<br>**Indemnification Obligations** | The Property is defined in <u>Section 1</u> of the Purchase Agreement and includes, among other things, the Melrose Street Parcel and the Noll Street Parcel, including the buildings erected thereon, any and all other fixtures and improvements erected thereon, all fixtures and equipment attached or appurtenant thereto, the interest of the landlord in the Leases, all air and development rights |

11

|  | appurtenant to the Land, and (to the extent assignable), all permits and licenses held solely for use in connection with the Land or Improvements.  At Closing, Purchaser shall assume, *inter alia*, all of Sellers' right, title and interest as landlord or otherwise under each of the Leases and of any security deposits required to be held by Sellers on the Closing Date; all of Sellers' right, title and interest in and to the Contracts (to the extent assignable) and all other Contracts entered into by Sellers during the executory period; the administrative agent agreement with HPDC or HDC, and any payment obligations due thereunder to the extent first accruing on and after the Closing Date; any design and construction contracts, plans and specifications and building permits relating to Pending TI Work; all of the obligations pursuant to the Regulatory Agreement, the Mapping Agreement, the Union Agreements (to the extent set forth in <u>Section 9.4</u> of the Purchase Agreement), and any other document recorded against the Properties; and any and all obligations pursuant to the Restrictive Declaration.  Purchaser shall be solely responsible for and shall indemnify Sellers against and hold Sellers and Seller Related Parties harmless from any and all Employment Liabilities arising on or after the Closing Date with respect to Employees at the Properties on and after the Closing Date. |
|---|---|
| **Closing Date** | As set forth in <u>Section 4.1</u> of the Purchase Agreement, the Closing shall take place on the date which is 150 days after the Petition Date, subject to (i) two (2) thirty (30) day extensions of the Closing Date (not to exceed sixty (60) days in the aggregate, or 210 days from the Subsidiary Debtor  Petition Date) which may be exercised by Sellers or Purchaser in accordance with <u>Section 4.1</u> of the Purchase Agreement; (ii) Purchaser's ability to adjourn the Closing Date to a date not later than the one (1) year anniversary of the Subsidiary Debtor Petition Date if certain milestones are not timely met in accordance with <u>Section 9.1.9</u> of the Purchase Agreement; and (iii) other rights to adjourn the Closing in accordance with <u>Sections 2.3</u>, <u>10.1(i)</u>, <u>10.2</u> and/or <u>10.4</u> of the Purchase Agreement. |
| **"No Shop" Provision** | <u>Section 9.1.11</u> of the Purchase Agreement provides that, upon execution and through termination of the Purchase Agreement, Sellers shall not market, solicit, or respond to offers or provide due diligence information with respect to the Properties or negotiate with any other party regarding a sale of the all or any part of the Properties, subject to Sellers' fiduciary duties with respect to unsolicited expressions of interests, offers, or bids and any Bankruptcy Court order providing for or requiring a marketing and auction process. |
| **Free and Clear of Liens, Claims and Encumbrances** | Conveyance of title to the Properties to Purchaser shall be subject to the Permitted Exceptions (as such term is defined in the Purchase Agreement); provided that (x)  Sellers shall seek an order in the Seller Bankruptcy Proceedings that provides that the Properties are being sold to Purchaser free and clear of liens, claims and encumbrances, including, without limitation: (a) all mortgages encumbering the Properties, (b) Voluntary Liens, (c) the Enumerated Liens, (d) the Post-Execution Liens, and (e) the Remaining Liens; and (y) as set forth more fully in the Purchase Agreement, in the event that the Bankruptcy Court fails to issue an order permitting the Properties to be sold free and clear of certain liens, Sellers may (at their option), pay such liens from the proceeds of the Purchase Price, bond them, or cause the Title Company to omit such liens from Purchaser's owner's policy of title insurance. To the extent that Remaining Liens are not discharged by order |

12

| | |
|---|---|
| | of the Bankruptcy Court, Sellers shall, subject to Sections 2.4 and 22 of the Purchase Agreement, pay, discharge or remove such Remaining Liens at Sellers' sole expense to the extent such liens are in a liquidated amount and do not exceed $1,250,000.00 in the aggregate.. |
| **Termination** | Section 35.1 of the Purchase Agreement provides that the Parties may terminate the Purchase Agreement at any time prior to the Closing under the following conditions:<br><br>(a) By written agreement of Purchaser and Sellers;<br><br>(b) As set forth in Section 11.2 of the Purchase Agreement, by Purchaser if Sellers have breached any covenant or agreement required to be performed by Sellers pursuant to the Purchase Agreement and the Closing does not occur by reason thereof;<br><br>(c) As set forth in Section 11.1 of the Purchase Agreement, by the Sellers in the event of a Purchaser Default;<br><br>(d) By any party if (i) the Conditions to Closing set forth in Section 10 of the Purchase Agreement are not satisfied or waived by the party having the right to waive the applicable condition, (ii) either the Interim Bid Protections Order or Final Bid Protections Order are not entered by the Bankruptcy Court as provided for in Section 9.1.7 of the Purchase Agreement (as most recently amended on September 1, 2021), or (iii) the Closing does not occur by the Outside Date, other than as described at subsections (b), (c), (d)(i) or (d)(ii) of Section 35.1 of the Purchase Agreement; or<br><br>(e) By Sellers, if (i) the Purchase Agreement is in full force and effect and Sellers determine in the exercise of their fiduciary duties to sell the Properties to a person or entity other than Purchaser or (ii) the Bankruptcy Court shall enter an order approving a sale or a chapter 11 plan that provides for any sale or other disposition of the Properties to a person or entity other than Purchaser, including by reason of an auction.<br><br>In addition to what is set forth in Section 35.1(d)(ii), Section 9.1.7 of the Purchase Agreement provides that Purchaser may terminate the Purchase Agreement in the event that this Court does not enter either an Interim Bid Protections Order on or before September 21, 2021 or a Final Bid Protections Order on or before October 5, 2021.<br><br>Further, Purchaser may terminate the Purchase Agreement prior to Closing in the event of the occurrence of a Breach which has a Material Adverse Effect, subject to the right of Sellers to nullify such termination, all as set forth more fully in Section 11.3 of the Purchase Agreement.<br><br>Lastly, Purchaser may terminate the Purchase Agreement in accordance with Section 12.2 thereof (as described more fully in the "Casualty and Condemnation" |

13

| | |
|---|---|
| | Section below). |
| **Casualty and Condemnation** | If, prior to the Closing, there shall occur damage to the Properties which would cost an amount greater than $7,500,000.00 to repair or a taking by condemnation of any material portion of the Properties (as such term is defined in Section 12.5 of the Purchase Agreement), Purchaser may elect to terminate the Purchase Agreement.<br><br>If, prior to the Closing, there shall occur damage to the Properties which would cost an amount less than $7,500,000.00 to repair or a taking by condemnation of any portion of the Properties that is not material, neither party shall have the right to terminate the Purchase Agreement but Sellers shall assign to Purchaser all of Sellers' interest in any insurance proceeds or condemnation awards which may be payable to Sellers on account of such casualty or condemnation and Sellers shall pay to Purchaser the amount of the deductible, if any, under Sellers' Properties insurance policy(ies), less all reimbursable amounts not received by Sellers from any insurance proceeds or condemnation awards paid to Sellers prior to the Closing. |
| **Treatment of Labor Agreements** | As set forth more fully in Section 9.4 of the Purchase Agreement, Purchaser shall (i) pursuant to the terms of the Purchase Agreement, offer to retain all Employees, which employment (if accepted by the applicable Employee) will continue uninterrupted without loss of seniority, compensation, benefits or employment subject to the Union Agreements and applicable law; (ii) comply with the terms of the DBSWA; (iii) assume all of Sellers' obligations with respect to the prevailing wage requirements of Section 421-a of the Real Property Tax Law; (iv) either (a) execute an agreement with PBS Facility Services Inc., Platinum Amenity Services and Dynamic Building Services, causing such entities to remain responsible for the employees at the Properties, which will provide for the continued retention of all employees in accordance with their present terms of employment, or (b) retain another management company or agent to cause the foregoing to occur; (v) if required to avoid any liability to Sellers on account of the Employees or collective bargaining agreements (except in the event that Purchaser executes a management agreement with a party who is a party to the Union Agreement on the Closing Date with respect to the Properties), execute (or cause such designee reasonably acceptable to Purchaser and the Union to execute) the Union Assumption Agreement. |

22.     In addition, the Purchase Agreement provides Purchaser with the following standard bid protections (collectively, the "**Bid Protections**"):

(a)     Break-Up Fee.  The payment of a break-up fee by Sellers to Purchaser in the amount of $20 million (the "**Break-Up Fee**") in the event:

14

(i)       the Purchase Agreement is terminated by Sellers following their election to exercise their fiduciary duties and the Properties are sold to a person other than Purchaser;

(ii)      the Purchase Agreement is terminated by Sellers in the event the Properties are sold or disposed to a person or entity other than Purchaser pursuant to an order of the Court approving such sale or disposition or confirming a plan of reorganization that effects such sale or disposition;

(iii)     Sellers perform a Sellers-Prohibited Act[5]; and/or

(iv)     if (A) either the Intern Bid Protections Order or Final Bid Protections Order is entered, (B) the Purchase Agreement is terminated by Sellers to consummate an Alternate Transaction,[6] and (C) such Alternate Transaction is fully-consummated.[7]

---

[5]    As set forth in Section 35.2 of the Purchase Agreement, the term "Sellers-Prohibited Act" is defined as each of the following actions occurring (a) between the issuance of the Final Bid Protections Order and (b) the earlier of the Closing Date and the termination of the Purchase Agreement:

> Sellers (i) sell the Properties or any part thereof to a third-party other than Purchaser or a permitted assignee thereof, or (ii) lease substantially all of either Property to a third-party other than Purchaser or a permitted assignee thereof, or (iii) refinance any mortgage encumbering any portion of the Properties, which prevents Sellers from being able to complete their performance in accordance with the terms of this Agreement or renders Sellers unable to deliver title to Purchaser as required under this Agreement, Purchaser's ability to purchase the Property in accordance with terms hereof, or (iv) willfully take any act intended to cause a termination (other than as expressly permitted under the terms hereof) or rejection of this Agreement, in each case which prevents Sellers from being able to complete their performance in accordance with the terms of this Agreement or renders Sellers unable to deliver title to Purchaser as required under this Agreement.

[6]    As set forth in Section 35.1(e) of the Purchase Agreement, the term "Alternate Transaction" is defined as either of the following:

> (i) if this Agreement is in full force and effect and Sellers determine in the exercise of their fiduciary duties to sell the Properties to a person or entity other than the Purchaser; or (ii) if the Bankruptcy Court shall enter an order approving a sale or a chapter 11 plan that provides for any sale or other disposition of the Properties to a person or entity other than Purchaser, including by reason of an auction.

[7]    Provided that if such Alternate Transaction is an auction ordered by the Bankruptcy Court, the Break-Up Fee will only be payable so long as Purchaser permits the Purchase Agreement to remain in effect and to serve as a "stalking horse" contract. *See* Section 35.2(d) of the Purchase Agreement.

(b)     <u>Expense Reimbursement</u>.  The reimbursement of reasonable costs and expenses (including reasonable attorneys' fees) incurred in connection with Purchaser's due diligence, negotiation, and entry into the Purchase Agreement not to exceed $150,000.00 (the "**Expense Reimbursement**") payable to Purchaser if the Purchase Agreement is terminated by:

(i)     Purchaser due to Sellers' breach of any covenant or agreement required to be performed by Sellers thereunder and the Closing does not occur by reason thereof;

(ii)    Purchaser if the Interim Bid Protections Order or Final Bid Protections Order are not entered by the Court as, when and how required;

(iii)   either Purchaser or Sellers if (A) the Conditions to Closing (as defined in the Purchase Agreement) are not satisfied or waived in accordance with the Purchase Agreement; or (B) the Closing does not occur by the Outside Date[8] (other than as set forth in Sections 35.1(b), (c), (d)(i) or (d)(ii) of the Purchase Agreement);

(iv)    either Purchaser or Sellers if (A) the Final Bid Protections Order is entered and (B) the Court does not enter the Confirmation Order by the Outside Date;

(v)     either Purchaser or Sellers if (A) the Bid Procedures Order is entered and (B) the Court directs an auction to be held, and Purchaser does not permit the Purchase Agreement to remain as a stalking horse contract; or

(vi)    either Purchaser or Sellers, if Sellers do not obtain Series E Bondholder Approval or the Executed RSA as and when required in accordance with the Purchase Agreement.[9]

---

[8]     As set forth in Section 4.1 of the Purchase Agreement, the term "Outside Date" is defined as two hundred ten (210) days after the commencement date of the Subsidiary Debtor Petition Date.  See PSA, Section 4.1.

[9]     As set forth above, following a vote of the Series E Bondholders in which they overwhelmingly voted to support the Purchase Agreement and the terms of a proposed restructuring to implement the terms of the Sale pursuant to a chapter 11 plan, the Subsidiary Debtors and the Trustee for the Series E Bondholders entered into the RSA.

### The Relief Requested Is Warranted
### And In Best Interests of Subsidiary Debtors and Economic Stakeholders

23.     The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  In this district, "[t]he standard used for judicial approval of the use of estate property outside of the ordinary course of business is [] the business judgment of the debtor."  *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014) (citing *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003)).  Additionally, section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

### A.      The Bid Protections are Reasonable and Appropriate

24.     The Subsidiary Debtors ran an exhaustive process to locate the highest and best offer for the Properties.  The Marketing and Sale Process produced the Atlas Bid, which represented the only credible and actionable bid from a committed purchaser most capable of consummating a value-maximizing transaction in an efficient manner.  In exercising their sound business judgment, the Subsidiary Debtors selected the Atlas Bid and concluded that executing the Purchase Agreement to sell the Properties for approximately $506 million and agreeing to the terms and conditions thereof would best serve the interests of the estates and all stakeholders.  The Purchaser, however, would not agree to enter into the Purchase Agreement absent the Bid Protections and the Subsidiary Debtors' commitment to seek approval of those protections, on an interim and final basis, as set forth therein.  As described above, the Break-Up Fee and Expense

17

Reimbursement will be paid to the Purchaser in certain limited circumstances generally relating to the consummation of an Alternate Transaction. As set forth in the Manning Declaration, based on the circumstances of these Chapter 11 Cases and for the reasons described below, the Bid Protections are fair and reasonable and will maximize value for the Subsidiary Debtors' estates, creditors, and other stakeholders. Accordingly, the Subsidiary Debtors' consent to the Bid Protections represents a proper exercise of the Subsidiary Debtors' business judgment and they should be authorized and approved.

25. Courts have recognized that the paramount goal of any proposed sale of property of a debtor's estate is maximizing value. *In re Metaldyne Corp.*, 409 B.R. 661, 667–68 (Bankr. S.D.N.Y. 2009) ("It is the overarching objective of sales in bankruptcy to maximize value to the estate."); *In re Integrated Resources, Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("'It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.'") (emphasis in original). Break-up fee arrangements, which have been described as "an incentive payment to a prospective purchaser with which a company fails to consummate a transaction," are a common feature of many sale processes—whether conducted inside or outside of a bankruptcy court. *See Integrated Resources*, 147 B.R. at 653 ("Break-up fee arrangements outside of bankruptcy are presumptively valid under the business judgment rule."); *see also In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) (approving bidding protections in form of break-up fee and expense reimbursement). This is because "[b]reak up fees are important tools to encourage bidding and to maximize the value of the debtor's assets." *Integrated Resources*, 147 B.R. at 659.

26.     When considering the approval of bid protections, such as the Break-Up
Fee, "there are 'three questions for courts to consider in assessing [such] break-up fees: (1) is the
relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation;
(2) does the fee hamper, rather than encourage, bidding; [and] (3) is the amount of the fee
unreasonable relative to the proposed purchase price?'" *Genco Shipping*, 509 B.R. at 465 (quoting
*Integrated Resources*, 147 B.R. at 657) (citing *Metaldyne*, 409 B.R. at 670).

27.     The Bid Protections set forth in the Purchase Agreement meet the "business
judgment rule" standard.  <u>First</u>, the Bid Protections are the product of good faith, arm's length
negotiations among (a) the Purchaser, (b) the Subsidiary Debtors, and (c) representatives of the
Mezzanine Lender and the Series E Noteholders, who collectively comprise two of the Debtors'
primary creditor constituencies.  These protections, individually and collectively, were a material
inducement for, and condition of, the Purchaser's entry into the Purchase Agreement.  The
Purchaser was unwilling to hold open its bid without assurance of payment of the Break-Up Fee
and Expense Reimbursement under the conditions set forth in the Purchase Agreement.  The
Purchaser and Subsidiary Debtors are wholly unrelated, sharing no officers, directors,
shareholders, incorporators, employees or economic interests—other than as embodied in these
transactions—in common.  Additionally, the Purchaser is not an "insider" as that term is defined
in the Bankruptcy Code.  11 U.SC. § 101(31).

28.     <u>Second</u>, approval of the Bid Protections will enhance the value of the
Subsidiary Debtors' estates.  The Atlas Bid, which is embodied in the Purchase Agreement, lays a
foundation for the purchase of the Denizen and provides the Subsidiary Debtors with an
opportunity to move forward with a transaction that has a high likelihood of consummation with a

19

contractually committed party at a fair and reasonable purchase price.  Additionally, the Break-Up

Fee enhances estate value by ensuring that a fair market value offer from a credible buyer (who

has already furnished a $10 million good faith deposit and who will be obligated to deposit another

$10 million upon approval of the Bid Protections) remains viable for the Subsidiary Debtors and

that the Purchaser remains committed to the transaction.  Further, although the Subsidiary Debtors

have already run a comprehensive and robust prepetition Marketing and Sale Process and

concluded that the Atlas Bid represents the best and only credible and actionable offer for the

Denizen in the Subsidiary Debtors' reasonable business judgement, with the presence of a

"fiduciary out," the Break-up Fee will not "unduly hamper" the Subsidiary Debtors' efforts to

maximize value for their estates. *See Genco Shipping*, 509 B.R. at 465 (finding that a termination

fee included in a restructuring transaction would not unduly hamper the debtors' efforts to

maximize value for the estates, in part, because the debtors retained a fiduciary out).  The Bid

Protections were designed to induce the only credible bidder to enter into the transaction and

provide the Subsidiary Debtors with the certainty and benefits of the value-maximizing transaction

reflected in the Purchase Agreement, yet at the same time they establish a floor such that interested

bidders, including those who participated in the Marketing and Sale Process, may still submit

proposals for an Alternate Transaction that represent a better and higher offer.  Accordingly, the

authorization and approval of the Bid Protections will enhance rather than hamper competitive

bidding.

29.     Third, the amount of the Bid Protections is fair and reasonable under the

circumstances and in relation to the proposed purchase price.  The Bid Protections, including the

proposed Break-Up Fee of $20 million and the Expense Reimbursement of $150,000, amount to

approximately 3.98% of the proposed $506 million of the cash consideration. Numerous courts have approved similar break-up fees and bid protections in this and other districts. *See, e.g.*, *In re Financial News Network, Inc.*, 980 F.2d 165, 167 (2d Cir. 1992) (noting without discussion an estimated $8.2 million break-up fee on $149.3 million in total consideration for transaction, representing approximately 5.49% of transaction value); *In re KB US Holdings, Inc*., No. 20-22962 (SHL) (Bankr. S.D.N.Y. Sept. 21, 2020) (ECF No. 184) (approving aggregate bid protections, including $2.625 million termination fee and negotiated expense amount of up to $750,000, equal to approximately 4.5% of $75 million bid); *In re Synergy Pharmaceuticals Inc.*, No. 18-14010 (JLG) (Bankr. S.D.N.Y. Jan. 7, 2019) (ECF No. 181) (approving aggregate bid protections, including $7 million break-up fee and expense reimbursement of up to $1.95 million, equal to approximately 4.83% of $185 million bid); *In re Hooper Holmes, Inc. d/b/a Provant Health*, No. 18-23303 (RDD) (Bankr. S.D.N.Y. Sept. 20, 2018) (ECF No. 119) (approving aggregate bid protections, including $810,000 break-up fee and expense reimbursement of up to $300,000, equal to approximately 4.11% of $27 million bid); *In re Hostess Brands, Inc.*, No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 11, 2013) (ECF No. 2275) (approving aggregate bid protections, including $12.3 million break-up fee and transition expense reimbursement of up to $10 million, equal to approximately 5.43% of $410 million bid); *In re MSR Resort Golf Course LLC*, No. 11-10372 (SHL) (Bankr. S.D.N.Y. Dec. 20, 2011) (ECF No. 920) (approving aggregate bid protections, including $4.5 million topping fee and expense reimbursement of up to $1.5 million, equal to approximately 4% of $150 million bid); *In re Eagle Pipe, LLC*, No. 20-34879 (MI) (Bankr. S.D. Tex. Oct. 30, 2020) (ECF No. 97) (authorizing debtor to select stalking horse bidder and provide bid protections, including break-up fee of up to 4% of bid and expense reimbursement of up to

$200,000); *In re Shiloh Industries, Inc.*, 20-12024 (LSS) (Bankr. D. Del. Sept. 25, 2020)
(ECF No. 206) (approving aggregate bid protections, including $7.085 million break-up fee and
expense reimbursement of up to $1.5 million, equal to approximately 3.93% of $218 million bid).

30.     Additionally, courts in this jurisdiction have routinely provided
administrative priority status to break-up fees and expense reimbursements in the event that the
applicable bidder becomes entitled to them.  *See, e.g.*, *In re KB US Holdings, Inc*., No. 20-22962
(SHL) (Bankr. S.D.N.Y. Sep. 17, 2020) (ECF No. 164) (approving treatment of break-up fee and
expense reimbursement as administrative expenses); *In re Hooper Holmes, Inc. d/b/a Provant
Health*, No. 18-23303 (Bankr. S.D.N.Y. Sept. 20, 2018) (ECF No. 119) (same); *In re Nine West
Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. May 7, 2018) (ECF No. 223) (same); *In re
Fairway Group Holdings Corp.*, No. 20-10161 (JLG) (Bankr. S.D.N.Y. Feb. 21, 2020)
(ECF No. 202) (approving treatment of break-up fee as administrative expense).  Here, the Bid
Protections were a material inducement for, and a condition of, Atlas' execution of the Purchase
Agreement.  Further, Atlas was unwilling to hold open the Atlas Bid without assurance of the Bid
Protections.  Indeed, granting these Bid Protections assures the Subsidiary Debtors of a Sale to a
contractually-committed purchaser at a price the Subsidiary Debtors believe is fair and reasonable
in their sound business judgment.  Accordingly, both the Break-Up Fee and Expense
Reimbursement should be treated as allowed administrative expenses in the event Atlas becomes
entitled to them.

31.     Based on the foregoing, the Bid Protections represent a reasonable exercise
of the Subsidiary Debtors' prudent business judgment and should be authorized and approved.

**Reservation of Rights**

32.     Nothing contained herein is intended, or shall be construed, as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

**The Debtors Satisfy Bankruptcy Rule 6003(b)**

33.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may approve a motion to "to use, sell, lease, or otherwise incur an obligation regarding property of the estate."  The Subsidiary Debtors face immediate and irreparable harm if the relief requested herein is not approved.  The Atlas Bid represents a firm commitment to enter into a transaction that will maximize value for the benefit of the estates and their creditors and will set a floor for other potential purchasers who may seek to propose an alternative transaction.  Absent the relief requested herein, the Purchaser will have the right to terminate the Purchase Agreement, which is the cornerstone of the Plan and the sole source of recoveries for creditors in these Chapter 11 Cases.  Therefore, the Subsidiary Debtors submit that the requirements of Bankruptcy Rule 6003(b) have been satisfied.

## Bankruptcy Rules 6004(a) and (h)

34.     To implement the foregoing successfully, the Subsidiary Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  The relief requested herein is critical to the Subsidiary Debtors' efforts to preserve and maximize the value of their estates.  To obtain maximum value of their estates and minimize administrative expenses, the Subsidiary Debtors must be able to proceed quickly.    Accordingly,  the  Subsidiary  Debtors  submit  that  the  notice  requirements  under Bankruptcy Rule 6004(a) have been satisfied and that a waiver of the 14-day stay period is appropriate under Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## Notice

35.     Notice of this Motion will be provided to (i) William K. Harrington, the U.S. Department of Justice, Office of the U.S. Trustee, 201 Varick Street, Room 1006, New York, NY 10014 (Attn: Andrea B. Schwartz, Esq. and Shara Cornell, Esq.); (ii) the Debtors' top twenty (20) unsecured creditors; (iii) the Internal Revenue Service; (iv) the United States Attorney's Office for the Southern District of New York; (v) counsel to Mishmeret Trust Company Ltd., as Trustee for the Bondholders, Chapman & Cutler LLP, 1270  Sixth Avenue, New York, New York 10020 (Attn: Michael Friedman, Esq., Stephen R. Tetro II, Esq., and Aaron Krieger, Esq.); (vi) counsel to MREF REIT Lender 9 LLC, as Mezzanine Lender,  Goodwin Procter LLP, The New York Times Building, 620 Eighth Avenue, New York, New York 10018 (Attn: Michael H. Goldstein, Esq., and Kizzy L. Jarashow, Esq.); (vii)  counsel to JPMorgan Chase Bank, N.A., as

24

Mortgage Lender to EG I, Fried, Frank, Harris, Shriver & Jacobson LLP, 1 New York Plaza, New York, NY 10004 (Attn: Gary Kaplan, Esq. and Michael Barker, Esq.); and (viii) counsel to Atlas Capital Group, LLC, as Purchaser, Thompson Hine LLP, 335 Madison Avenue, 12th Floor, New York, New York 10017 (Attn: John Bae, Esq. and Jonathan Hawkins, Esq.) (collectively, the "**Notice Parties**").  The Debtors respectfully submit that no further notice is required.

36.    No previous request for the relief sought herein has been made by the Subsidiary Debtors to this Court or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE the Subsidiary Debtors respectfully request entry of the interim and final orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: September 14, 2021
　　　　New York, New York

          */s/ Matthew P. Goren*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Attorneys for the Initial Debtor and*
*Proposed Attorneys for the Subsidiary Debtors*

## Exhibit A

**Proposed Bid Protections Order**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Attorneys for the Initial Debtor and*
*Proposed Attorneys for the Subsidiary Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| ------------------------------------------------------------X | : | |
| **In re** | : | **Chapter 11** |
| | : | |
| **EVERGREEN GARDENS MEZZ LLC,** *et al.*, | : | **Case No. 21-10335 (MG)** |
| | : | |
| **Debtors.**[1] | : | **(Joint Administration Pending)** |
| | : | |
| ------------------------------------------------------------X | | |

**INTERIM ORDER (I) AUTHORIZING**
**AND APPROVING BID PROTECTIONS AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**"),[2] dated September 14, 2021 [ECF No. [__]], of

Evergreen Gardens Mezz LLC ("**EGM**" or the "**Initial Debtor**"), together with Evergreen

Gardens I LLC ("**EG I**") and Evergreen Gardens II LLC ("**EG II**" and, together with EG I,

the "**Subsidiary Debtors**" and, together with the Initial Debtor, the "**Debtors**"), as debtors and

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Evergreen Gardens Mezz LLC (0416); Evergreen Gardens I LLC (2211); and Evergreen Gardens II LLC (6782). The Debtors' principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion or the Purchase Agreement, as applicable.

debtors in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), pursuant to sections 105(a), 363 and 503(b) of title 11 of the United States Code (the "**Bankruptcy Code**") and  Rules 2002, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of interim and final orders (i) authorizing and approving the terms for the proposed payment of the Break-Up Fee and Expense Reimbursement (each as defined below and, collectively, the "**Bid Protections**") in connection with a sale of all or substantially all of the Subsidiary Debtors' assets pursuant to that certain Agreement of Purchase and Sale dated August 2, 2021 (as amended by that certain first amendment, dated August 19, 2021, that certain second amendment, dated September 1, 2021, and as may be further modified, amended, or supplemented from time to time, and together with all schedules and exhibits thereto, the "**Purchase Agreement**"), by and among the Subsidiary Debtors and Atlas Capital Group, LLC (the "**Purchaser**"), and (ii) granting related relief, all as more fully set forth in the Motion; and the Court having held a hearing to consider the relief requested in the Motion on an interim basis (the "**Hearing**"); and upon the record of the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion and the accompanying declarations establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

2

**IT IS HEREBY FOUND AND DETERMINED THAT:[3]**

A.    <u>Jurisdiction and Venue</u>.    Consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The Court has jurisdiction to consider the relief requested in accordance with 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).

B.    <u>Bid Protections</u>.    The Purchase Agreement provides for the following Bid Protections: <u>First</u>, a termination payment in the amount of $20,000,000.00 (the "**Break-Up Fee**") payable to Purchaser in the event: (i) the Purchase Agreement is terminated by Sellers following their election to exercise their fiduciary duties and the Properties are sold to a person other than Purchaser; (ii) the Purchase Agreement is terminated by Sellers in the event the Properties are sold or disposed to a person or entity other than Purchaser pursuant to an order of the Court approving such sale or disposition or confirming a plan of reorganization that effects such sale or disposition; (iii) Sellers perform a Sellers-Prohibited Act; and/or; (iv) if (A) either the Interim Bid Protections Order or Final Bid Protections Order is entered, (B) the Purchase Agreement is terminated by Sellers to consummate an Alternate Transaction, and (C) such Alternate Transaction is fully-consummated.  <u>Second</u>, the reimbursement of reasonable costs and expenses (including reasonable attorneys' fees) incurred in connection with Purchaser's due diligence, negotiation, and entry into the Purchase Agreement not to exceed $150,000.00 (the "**Expense Reimbursement**")

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

payable to Purchaser if the Purchase Agreement is terminated by: (i) Purchaser due to Sellers'
breach of any covenant or agreement required to be performed by Sellers thereunder and the
Closing does not occur by reason thereof; (ii) Purchaser if the Interim Bid Protections Order or
Final Bid Protections Order are not entered by the Court as, when and how required; (iii) either
Purchaser or Sellers if (A) the Conditions to Closing (as defined in the Purchase Agreement) are
not satisfied or waived in accordance with the Purchase Agreement; or (B) the Closing does not
occur by the Outside Date (other than as set forth in Section 35.1(b), (c), (d)(i) or (d)(ii) of the
Purchase Agreement); (iv) either Purchaser or Sellers if (A) the Final Bid Protections Order is
entered and (B) the Court does not enter the Confirmation Order by the Outside Date; (v) either
Purchaser or Sellers if (A) the Bid Procedures Order is entered and (B) the Court directs an auction
to be held, and Purchaser does not permit the Purchase Agreement to remain as a stalking horse
contract; or (vi) either Purchaser or Sellers, if Sellers do not obtain Series E Bondholder Approval
or the Executed RSA as and when required in accordance with the Purchase Agreement.  The Bid
Protections are reasonable and appropriate and represent the best method for maximizing the value
of the Subsidiary Debtors' estates.

        C.     <u>Adequate Notice</u>.  Due and proper notice of the relief requested in the
Motion and a reasonable opportunity to object or be heard regarding the relief granted herein has
been afforded to all parties in interest in these Chapter 11 Cases.

        D.     <u>Relief is Warranted</u>.  The Subsidiary Debtors' estates will be immediately
and irreparably harmed if the interim relief requested in the Motion is not granted.  The Debtors
have articulated good and sufficient reasons for approving the Bid Protections and the legal and

factual bases set forth in the Motion establish just and sufficient cause to grant the relief requested therein.

## IT IS HEREBY ORDERED THAT

1.      The Motion is granted on an interim basis to the extent set forth herein.

2.      The Bid Protections, on the terms set forth in the Purchase Agreement, are approved on an interim basis.  The Subsidiary Debtors are hereby authorized to pay in cash any amounts owed to the Purchaser on account of the Break-Up Fee and the Expense Reimbursement in accordance with the terms of the Purchase Agreement without further action or order by the Court.

3.      If payable, the Break-Up Fee and Expense Reimbursement shall constitute allowed administrative expenses pursuant to section 503(b) of the Bankruptcy Code.

4.      A final hearing on the Motion shall be held **on _____, 2021, at ____.m. (Prevailing Eastern Time)** (the "**Final Hearing**") and any objections or responses to the Motion shall be in writing, filed with the Court, and served upon (i) the attorneys for the Initial Debtor and the proposed attorneys for the Subsidiary Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Gary T. Holtzer and Matthew P. Goren); and (ii) the Notice Parties, in each case so as to be received no later than ____**.m. (Prevailing Eastern Time) on _____, 2021**.

5.      Under the circumstances of theses Chapter 11 Cases, the requirements of Bankruptcy Rule 6003 are satisfied.

6.      Under the circumstances of these Chapter 11 Cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

5

7.     Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

8.     The Debtors are authorized to take all action necessary to effectuate the relief granted in this Interim Order.

9.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Interim Order.

Dated: _____, 2021
        New York, New York

_____
HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

6

**<u>Exhibit B</u>**

**Hwang Declaration**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Attorneys for Initial Debtor and*
*Proposed Attorneys for the Subsidiary Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X

| | | |
|---|---|---|
| | : | |
| **In re** | : | **Chapter 11** |
| | : | |
| **EVERGREEN GARDENS MEZZ LLC,** *et al.*, | : | **Case No. 21-10335 (MG)** |
| | : | |
| **Debtors.**[1] | : | **(Joint Administration Pending)** |
| | : | |

---------------------------------------------------------------X

**DECLARATION OF HELEN HWANG**
**IN SUPPORT OF MOTION OF DEBTORS PURSUANT TO**
**11 U.S.C. §§ 105, 363, AND 503(b) AND FED. R. BANKR. P. 2002, 6003, 6004,**
**AND 9014 FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING**
**AND APPROVING BID PROTECTIONS AND (II) GRANTING RELATED RELIEF**

I, Helen Hwang, pursuant to section 1746 of title 28 of the United States Code, hereby

declare that the following is true and correct to the best of my knowledge, information, and belief:

1.      My name is Helen Hwang.  I am over the age of 18 and competent to testify.

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Evergreen Gardens Mezz LLC (0416); Evergreen Gardens I LLC (2211); and Evergreen Gardens II LLC (6782).  The Debtors' principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

2.       I am a Senior Executive Managing Director with Meridian Investment Sales ("**MIS**"), a leading investment sales firm based in New York City, which is a segment of Meridian Capital Group, LLC, one of the nation's leading real estate finance advisory firms ("**Meridian Capital**" and, collectively with MIS, "**Meridian**").  In my capacity as Senior Executive Managing Director, I am the head of Meridian's Institutional Investment Sales Group, which focuses on large, institutional transactions and advisory assignments primarily in New York City.  In February of 2021, Meridian was engaged by All Year Holdings Limited and its affiliates (collectively, "**All Year**") to serve as the exclusive sales broker to market the Denizen (as defined below) for sale.  I submit this declaration in support of *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363, and 503(b) and Fed. R. Bankr. P. 2002, 6003, 6004, and 9014 for Entry of Interim and Final Orders (I) Authorizing and Approving Bid Protections and (II) Granting Related Relief* (the "**Motion**") filed by Evergreen Gardens Mezz LLC ("**EGM**" or the "**Initial Debtor**"), together with Evergreen Gardens I LLC ("**EG I**") and Evergreen Gardens II LLC ("**EG II**" and, together with EG I, the "**Subsidiary Debtors**" and, together with the Initial Debtor, the "**Debtors**"), as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

## Qualifications

3.       I have more than 22 years of real estate sales, advisory, valuation, and appraisal experience.  I joined MIS as Senior Executive Managing Director in September of 2015 shortly after the firm founded its investment sales division.  I have executed over 88 institutional sales and recapitalization transactions exceeding $26 billion in value and have an extensive track record of successfully executing large and complex transactions across all asset sectors.

2

4.      Before joining MIS, I was Executive Vice President as head of New York City Investment Sales at Cushman & Wakefield.  I received a Bachelor of Science degree from the Cornell University School of Hotel Administration (Real Estate Finance), where I graduated "With Distinction."  I received a master's degree in Real Estate Investment and Development from New York University.  I am also a New York State Certified Real Estate Appraiser and a New York and New Jersey Licensed Salesperson.  I am recognized by numerous trade publications and industry groups as a New York City market expert and have been invited as a guest speaker at numerous conferences about the New York City institutional investment sales market. Additionally, I have been presented with numerous awards over my career for my professional achievements, including the Real Estate Board of New York's esteemed Robert T. Lawrence Memorial award for Deal of the Year in 2012.

5.      Founded in 1991, Meridian is the country's most active dealmaker and one of the nation's leading commercial real estate finance, investment sales and retail leasing advisors. Since its inception, the company has closed more than $425 billion in transactions with the full complement of capital providers, including local, regional and national banks, CMBS lenders, agency lenders, mortgage REITs, life insurance companies, credit unions and private equity funds. Meridian represents many of the world's leading real estate investors and developers and the company's expansive platform has specialized practices for a broad array of property types including office, retail, multifamily, hotel, mixed-use, industrial, and healthcare and senior housing properties.  In 2020, Meridian closed approximately $40 billion in financing across more than 250 unique lenders.   Meridian is headquartered in New York City, has approximately 305 employees, and offices in New Jersey, Maryland, Illinois, Ohio, Florida, and California.

3

6.      The team at MIS Institutional Investment Sales team is comprised of seven professionals with over 100 years of combined real estate experience.  The senior members of the team each have 20 plus years of real estate investment sales experience and are specialized in large and complex real estate transactions.  The team has extensive multifamily transaction history having executed $3.5 billion in multifamily transactions over the past ten years together.  Representative transactions include the sale of 175 West 87th Street (266 units $220.5 million), 60 East 12th Street (133 units $107.5 million), 220 East 72nd Street (145 units $159.5 million), 22 River Terrace (324 units $255.0 million) and 88 Leonard Street sold twice (352 units for $215.0 million in 2012 and $242.1 million in 2016).

7.      The MIS Institutional Investment Sales team is also one of the only teams that has closed multiple large multifamily transactions since the beginning of the Covid-19 pandemic, having successfully executed more than $450 million in transactions since March 2020, including the $142.0 million sale of 15 Park Row in January 2021 and the $211.4 million sale of 1 Union Square South, which was negotiated in April through May 2020 and successfully closed in November 2020.

8.      Except as otherwise indicated, all facts set forth in this declaration (this "**Declaration**") are based upon my personal knowledge of the Subsidiary Debtors' operations and finances, personal knowledge gleaned during the course of my engagement, my discussions with the Subsidiary Debtors' senior management, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Subsidiary Debtors' operations and financial affairs.  I am authorized to submit this Declaration on behalf of the

4

Subsidiary Debtors.  If called upon to testify, I could and would testify competently to the facts set forth herein.

### Prepetition Marketing and Sale Process

9.    Meridian was engaged by the Company on February 24, 2021 to conduct a marketing and sale process (the "**Marketing and Sale Process**") for a newly completed, 911-unit, residential complex located in Bushwick, Brooklyn.  The Property was built in two phases and each phase is located on its own legal tax parcel: one at 123 Melrose Street (468 units) (the "**Denizen X**") and the other at 54 Noll Street (443 units) (the "**Denizen Y**"; together, with the Denizen X, the "**Denizen**" or the "**Property**").  The Denizen X is owned by EG I and the Denizen Y is owned by EG II.  The Subsidiary Debtors, in consultation with Meridian, determined that marketing the Denizen X and Denizen Y for sale as part of a single transaction would yield maximum value because it would avoid the potential legal and operational challenges resulting from separate ownership of the two parcels.  Throughout the Marketing and Sale Process, the Subsidiary Debtors and Meridian worked to ensure that the process was transparent, inclusive, efficient, and value-maximizing.

10.    On February 25, 2021, Meridian commenced the Marketing and Sale Process.  At the outset of this process, Meridian facilitated the issuance of a press release announcing the Denizen offering in the online real estate publication The Real Deal[2] and conducted a broad email outreach campaign that encompassed all persons and entities in Meridian's investor database who elect to receive offerings.  Through this campaign, Meridian contacted over 2,000 prospective buyers, including, but not limited to, private investors,

---

[2]    A copy of The Real Deal press release regarding the Denizen offering is attached hereto as **Exhibit 1**.

institutions, pension funds, family offices, and REITs.  As a result of these efforts, approximately 142 investor groups executed confidentiality agreements and approximately twenty-nine (29) investor groups toured the Denizen.  To enhance and facilitate the Marketing and Sale Process, on or around March 4, 2021, Meridian established a virtual data room and due diligence library (the "**Data Room**") comprised of various materials and proprietary information, including, but not limited to, an offering memorandum, historical operating statements, service contracts, and information regarding staffing, payroll, and real estate taxes.  Each of the approximately 142 investor groups that executed confidentiality agreements were provided access to the Data Room.

11.    At the appropriate time, following an adequate due diligence and review period, the Subsidiary Debtors, through Meridian, requested investor groups submit first round bids by April 6, 2021.  Fifteen first round bids, five (5) written and ten (10) verbal, were received (collectively, the "**First Round Bids**"), with the last written bid received near the end of April 2021.  The Subsidiary Debtors, in consultation with Meridian, evaluated each of the First Round Bids.  This evaluation focused on several key criteria, including, but not limited to: (i) initial proposed purchase price; (ii) ability to increase the initial proposed purchase price; (iii) flexibility as to the general deal terms; (iv) willingness to waive a due diligence period or ability to complete all due diligence prior to executing a purchase and sale agreement; and (v) willingness to enter into a purchase and sale agreement with a hard, non-refundable deposit.  Based on this review, the Subsidiary Debtors, in consultation with Meridian, invited six (6) investor groups to participate in the second round of the Marketing and Sale Process.

12.    Each of the six (6) investor groups that participated in the second round were provided with the Subsidiary Debtors' proposed form of purchase and sale agreement and

encouraged to provide comments thereto. This was intended to help Meridian and the Subsidiary Debtors better understand, and aid in their evaluation of, the terms upon which each of the six (6) investor groups were willing to transact. Each of the investor groups was also granted access to additional materials contained in the Data Room to support refinement of their bids. Additionally, each of the investor groups was requested to provide detailed information about their potential equity partners in order to confirm capability to close a potential sale transaction. Where an investor group identified a potential equity partner, Meridian interviewed said partner to ascertain detailed financial information and identify any potential contingencies. The investor groups were requested to submit second round bids by May 24, 2021.

13.    At the conclusion of the second round of the Marketing and Sale Process, four (4) bids were submitted by the participating investor groups (collectively, the "**Second Round Bids**"), including the bid submitted by Atlas Capital Group, LLC (Atlas Capital Group, LLC, collectively with its affiliates "**Atlas**"; such bid, the "**Atlas Bid**"). The Subsidiary Debtors, in consultation with Meridian, thoroughly reviewed each of the four (4) Second Round Bids, focusing on, among other things: (i) whether the applicable bidder had a committed equity partner; (ii) proposed purchase price; (iii) diligence contingencies; and (iv) the general deal terms. Based on this criteria and review, it became clear that the Atlas Bid was the only credible and actionable Second Round Bid for several reasons. First, Atlas had already raised the equity necessary to close a transaction for the Denizen and its principals had complete discretion and full authority from their equity source to move forward with the transaction. Two (2) of the three (3) other Second Round Bids were unable to identify a credible source of the

equity necessary to close a transaction for the Denizen.[3]  Second, the Atlas Bid was not contingent upon additional due diligence, and thus Atlas' deposit would become non-refundable upon execution of a purchase and sale agreement.  Aside from the Atlas Bid, each of the other Second Round Bids contained due diligence contingencies, including, among other things, requiring a minimum of thirty (30) days to conduct additional due diligence.  This meant that the Atlas Bid was the only Second Round Bid representing a "firm offer" pursuant to which the Subsidiary Debtors could expect to consummate a transaction for the Denizen.  Third, the only contingency contained in the Atlas Bid was that the transaction would need to be consummated pursuant to a chapter 11 plan of reorganization in order to, among other things, deliver Atlas clean title at closing.  Fourth, the Atlas Bid was the only Second Round Bid that was accompanied by a concise list of key business issues to the proposed form of purchase and sale agreement.

14.     When evaluating and discussing the Second Round Bids with the Subsidiary Debtors, my team recommended, in our professional opinion, that the Subsidiary Debtors select the Atlas Bid because, among other things, (i) the Atlas Bid provided the best combination of purchase price and certainty of executing and closing on a transaction; (ii) Atlas was the only investor group with discretionary equity fully lined-up and ready to commit to a transaction; and (iii) the Atlas Bid reflected the best purchase price for a non-contingent transaction.  The other Second Round Bids simply did not provide the certainty, credibility, and efficiency necessary to consummate a value-maximizing transaction.  In other words, after completing the comprehensive

---

[3]     The one (1) Second Round Bid that was able to identify a credible equity source proposed a structured transaction at a lower purchase price than that proposed in the Atlas Bid.

and robust Marketing and Sale Process, the Atlas Bid represented the best and only viable opportunity to consummate a value-maximizing transaction for the Denizen.

15.     The Subsidiary Debtors began negotiating the remainder of a purchase and sale agreement with Atlas on or around June 23, 2021.  Notably, while negotiations were underway, the other investor groups continued to have access to the Data Room and were permitted to continue their due diligence, but none came forward with a revised or more certain bid. Accordingly, the Purchase Agreement was executed on August 2, 2021.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated:  September 14, 2021
          New York, New York                 */s/ Helen Hwang*                                    
                                             Helen Hwang
                                             Senior Executive Managing Director
                                             Meridian Investment Sales

**<u>Exhibit 1 to Hwang Declaration</u>**

**The Real Deal Denizen Press Release**



Sponsored By



New York    Sponsored

Mar. 01, 2021 02:38 PM

# Meridian Capital's New York Institutional Investment Sales Team Hired to Sell 1,000-Unit Bushwick Complex



Meridian Capital Group announced today that its Institutional Investment Sales Group, led by Helen Hwang, has been tapped to sell the fee simple interest in The Denizen, a 1,000-unit, two-building complex located in the Bushwick neighborhood of Brooklyn,

NY. Completed in phases between 2018 and 2019, The Denizen is one of New York City's most amenitized rental buildings offering over 100,000 square feet of amenity space.

Situated on the former Rheingold Brewery site, The Denizen spans two full city blocks and is comprised of a nine-story building at 54 Noll Street and an eight-story building at 123 Melrose Street. In addition to its unparalleled amenities, which include an indoor pool, bowling lounge, rooftop farm, and gym with a rock-climbing wall, boxing ring and spin studio, The Denizen offers tenants a strong value proposition with rents 20% below Brooklyn waterfront neighborhoods. Given its price point, multiple lounge spaces that are ideal for work from home, and its proximity to Midtown Manhattan, The Denizen is an asset that is best suited for a post-Covid recovery.

Designed by renowned architect ODA and developed by All Year Management, The Denizen has won numerous awards for its design and architecture, including ULI's Excellence in Market Rate Housing Development in 2019. Artfully designed to cater to the neighborhood's young and creative population, which continues to move east in Brooklyn along the L-train, The Denizen features fifteen seven-story murals created by local artists, which open into the building's multiple landscaped courtyards. The Denizen also includes 130,000 square feet of commercial space and a 450-space parking garage. The 80/20 building benefits from a 25-year 421a tax abatement.

Helen Hwang, Senior Executive Managing Director of Meridian's Institutional Investment Sales group can be reached at (212) 468-5930 or hhwang@meridiancapital.com (http://hhwang@meridiancapital.com/) .

## Exhibit C

**Manning Declaration**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Attorneys for Initial Debtor and*
*Proposed Attorneys for the Subsidiary Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |  |
|---|---|---|
| -----------------------------------------------------------X | : |  |
| **In re** | : | **Chapter 11** |
|  | : |  |
| **EVERGREEN GARDENS MEZZ LLC,** *et al.*, | : | **Case No. 21-10335 (MG)** |
|  | : |  |
| **Debtors.**[1] | : | **(Joint Administration Pending)** |
|  | : |  |
| -----------------------------------------------------------X | : |  |

**DECLARATION OF**
**JEFFREY R. MANNING, SR. IN SUPPORT**
**OF MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105,**
**363, AND 503(b) AND FED. R. BANKR. P. 2002, 6003, 6004, AND**
**9014 FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING**
**AND APPROVING BID PROTECTIONS AND (II) GRANTING RELATED RELIEF**

    I, Jeffrey R. Manning, Sr., CTP pursuant to section 1746 of title 28 of the United States

Code, hereby declare that the following is true and correct to the best of my knowledge,

information, and belief:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Evergreen Gardens Mezz LLC (0416); Evergreen Gardens I LLC (2211); and Evergreen Gardens II LLC (6782). The Debtors' principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

1. My name is Jeffrey R. Manning, Sr. I am over the age of 18 and competent to testify.

2. I am a Managing Director of CohnReznick Capital Market Securities, LLC ("**CRC**"), which maintains offices at 500 East Pratt Street, Baltimore, MD 21202, and in other locations throughout the United States. CRC is the affiliated Financial Industry Regulatory Authority, Inc. ("**FINRA**") licensed investment bank of CohnReznick, LLP ("**CR**"). CRC provides corporate finance services, including structured equity, project finance, distressed M&A services, and restructuring. On August 24, 2021, CR was retained to serve as the financial advisor to the Subsidiary Debtors. I submit this declaration (this "**Declaration**") in support of the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363, and 503(b) and Fed. R. Bankr. P. 2002, 6003, 6004, and 9014 for Entry of Interim and Final Orders (I) Authorizing and Approving Bid Protections and (II) Granting Related Relief* (the "**Motion**").[2]

## Qualifications

3. I joined CRC as a Managing Director in 2014. In my current capacity as a Managing Director at CRC, I lead teams engaged primarily on providing investment banking services to companies operating in "special situations." CRC has been named an "Outstanding Investment Bank" by Turnaround and Restructuring Magazine in 2017 and 2018. I have extensive experience with respect to the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.

4. I received my Bachelor of Arts in Economics & Political Science from Yale University in 1981 and my Master of Business Administration from Columbia Business School in

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion.

4

1986.  I have nearly 40 years of experience in the corporate recovery industry, including investment banking, loan workout, operating restructuring, value investing, bankruptcy advising, and loan trading.  Early in my career, I worked in the Special Loan Department of Manufacturers Hanover Trust Co. in New York, NY, and as member of the operating restructuring team at Dun & Bradstreet.  Thereafter, I worked as a bank debt sales and trader at S.N. Phelps & Co., an investment bank and value investor located in Greenwich, Connecticut.  I have also led the special situations practices at several Wall Street firms, including Legg Mason and Rodman & Renshaw. Additionally, I previously served as the Chief Executive Officer and Senior Managing Director of FTI Consulting, Inc.'s wholly-owned FINRA licensed investment banking subsidiary, FTI Capital Advisors, LLC.  Prior to joining CRC in 2014, I was a Managing Director and the head of special situations at BDO Capital Advisors, LLC.

5.    I have earned the designation of Certified Turnaround Professional ("**CTP**") from the Turnaround Management Association® (the "**TMA**").  The TMA has appointed me as a Subject Matter Expert ("**SME**") in two areas of corporate recovery: (1) valuation of distressed enterprises and assets in chapter 11 bankruptcy proceedings; and (2) sales pursuant to section 363 of title 11 of the United States Code (the "**Bankruptcy Code**").  To provide investment banking services, I have qualified for and presently maintain the following FINRA licenses: (a) Series 7 (General Securities Representative); (b) Series 63 (Uniform Securities Agent State Law); (c) Series 24 (General Securities Principal); and (d) Series 79 (Investment Banking Representative).  I understand that only approximately 25 professionals in North America hold both the Series 24 license and the CTP designation.

5

6.      In 2013, I was recognized by the Turnaround Atlas Awards as one of the top 100 restructuring and turnaround professionals in the United States.  I am a frequent speaker at industry-related events and at universities, including, among others, Columbia Business School, the Darden School of Business at the University of Virginia, and The Wharton School of the University of Pennsylvania.  I have provided expert testimony in numerous chapter 11 proceedings in over a dozen jurisdictions.

7.      Over the course of my career, I have completed over 150 engagements in which I have primarily advised financially distressed companies operating both inside and outside of chapter 11 proceedings.  Representative bankruptcy engagements include, but are not limited to, the following chapter 11 proceedings: *In re Community Provider of Enrichment Services, Inc. d/b/a CPES Inc., et al.*, Case No. 9:20-bk-10554-DS (Bankr. C.D. Cal. 2020); *In re New England Motor Freight, Inc.*, Case No. 19-12809 (Bankr. D.N.J. 2019); *In re Garces Rest. Grp., Inc.*, Case No. 18-19054 (Bankr. D.N.J. 2018); *In re Rupari Holdings Corp. et.al.*, Case No. 17-10793 KJC (Bankr. D. Del. 2017); *In re Folts Home*, Case No. 17-60139 (Bankr. N.D.N.Y. 2017); *In re NJOY, Inc.*, Case No. 16-12076 (Bankr. D. Del. 2016); *In re Standard Automotive*, Case No. 02-11259 (Bankr. S.D.N.Y 2002); *In re SkyMall, LLC*, Case No. 15-00679-BKM (Bankr. D. Ariz. 2015).

8.      Excepted as otherwise indicated, all facts set forth in this Declaration are based upon: (a) my personal knowledge; (b) my review of the relevant documents, including information provided by other parties; (c) information provided to me by members of the CR team; (d) information provided to me by members of the Subsidiary Debtors management team or their professional advisors; and (e) my opinions based upon my experience.  If called upon to testify, I could and would testify competently to the facts set forth herein.

### Reasonableness of the Bid Protections

9.      Based on my professional experience, bid protections, including break-up fees and expense reimbursements, are a tool used to induce prospective purchasers to make a firm commitment to a transaction, and are widely applied and broadly accepted both inside and outside of bankruptcy courts.  It is my opinion that by providing bid protections in exchange for a prospective purchaser's firm commitment, a prospective seller receives a level of certainty that may be otherwise unavailable absent such protections.  In addition to certainty, I believe that bid protections provide a prospective seller with flexibility to consider alternative transaction proposals that exceed the sum of the prospective purchaser's bid and the protections.  Accordingly, in my professional opinion, bid protections are standard means to provide tremendous value to a prospective seller.

10.      In my experience, bid protections take on even greater importance in the chapter 11 context given the unique set of challenges and uncertainty inherent in bankruptcy.  I believe that when a prospective seller is experiencing financial distress, consummating a value-maximizing transaction with an increased degree of certainty is paramount because time and cash are typically in extremely short supply.  Accordingly, in my experience, after determining it has an opportunity to consummate a value-maximizing transaction, a debtor often seeks the authorization and approval of bid protections to, among other things: (a) induce the proposed purchaser to firmly commit to such value-maximizing transaction; and (b) compensate the proposed purchaser for the time, risk, and expense associated with (i) moving forward with a transaction in a potentially uncertain bankruptcy process and (ii) setting a floor for other potential purchasers who seek to propose an alternative transaction.  By implementing bid protections, I

7

believe that a debtor is able to demonstrate to critical stakeholders—including customers, suppliers, and employees—that the enterprise will be able to survive and emerge from chapter 11. In my opinion, for the aforementioned reasons, the authorization and approval of bid protections by U.S. Bankruptcy Courts has become customary in chapter 11 proceedings.

11.     In my professional experience, the facts and circumstances of the specific transaction largely influence the amount of bid protections a prospective seller should reasonably provide a prospective purchaser.  In my opinion, a prospective seller's consideration of the following factors are typically informative: (i) the timeline for consummating a transaction; (ii) the need for certainty; (iii) purchase price; (iv) whether "credible" alternatives exist; (v) whether an adequate "market-test" has occurred following comprehensive and professional marketing process; (vi) whether the prospective buyer has the sophistication and financial wherewithal to close the transactions; and (vii) whether the prospective buyer requires bid protections to proceed with a transaction.

12.     Based on my discussions with the Subsidiary Debtors and their professional advisors, including Meridian Capital Group ("**Meridian**"), and my review of the relevant documents and reports, I understand that in February 2021 the Subsidiary Debtors engaged Meridian to conduct a marketing and sale process (the "**Marketing and Sale Process**") for the "Denizen."  Meridian is one of North America's leading commercial real estate finance, investment sales, and retail leasing advisors, and it would be well qualified and professionally suited to market these properties.  The Meridian efforts lasted seven months, an adequate period of time to share the opportunity and reach prospective buyers, and involved: (a) the solicitation of over 2,000 prospective buyers; (b) 142 investor groups executing confidentiality agreements to

8

gain access a virtual data room and due diligence library (the "**Data Room**") containing various relevant materials and proprietary information; (c) approximately twenty-nine (29) potential investor groups toured the facilities; (d) the submission of fifteen (15) first round bids; and (e) the submission of four (4) second round bids. The Subsidiary Debtors, in consultation with Meridian, evaluated each bid based on specific criteria, and the Subsidiary Debtors ultimately selected a $506 million bid (the "**Atlas Bid**"), which contained no due diligence or financing contingencies and was submitted by a party with whom the Subsidiary Debtors have no affiliation. Based on my experience, these characteristics are indicative of a comprehensive and robust marketing and sale process that adequately tested the market.

13.     It is my understanding, based on conversations with the Subsidiary Debtors and their professional advisors, that following the Marketing and Sale Process, the Subsidiary Debtors have determined, in their business judgment, to seek the authorization and approval of certain bid protections, including a $20 million break-up fee (the "**Break-Up Fee**") and a $150,000 expense reimbursement (the "**Expense Reimbursement**" and, together with the Break-Up Fee, the "**Bid Protections**"), in connection with the proposed sale (the "**Sale**") of substantially all of their assets for $506 million in cash, as well as the assumption of certain liabilities, to ACI VI Denizen, LLC, an affiliate of Atlas Capital Group, LLC (collectively, "**Atlas**" or the "**Purchaser**"), pursuant to the terms of a signed purchase and sale agreement, dated August 2, 2021 (as amended by that certain first amendment, dated August 19, 2021, that certain second amendment, dated September 1, 2021, and as may be further modified, amended, or supplemented from time to time, and together with all schedules and exhibits thereto, the "**Purchase Agreement**").

14.     In the aggregate, the Bid Protections, including the Break-Up Fee and the Expense Reimbursement, represent approximately 3.98% of the cash portion of the purchase price. In my professional opinion, given the facts and circumstances of these Chapter 11 Cases as I understand them, the Bid Protections are reasonable, designed to maximize value, and in the best interests of the Subsidiary Debtors' estates for the reasons set forth herein.

15.     First, the Bid Protections provide the certainty of a transaction that the Subsidiary Debtors have determined, in their business judgment, will maximize value for their estates in a timely manner.  It is my understanding that Atlas provided the only firm commitment to consummate a transaction for the Denizen at the end of the Marketing and Sale Process, but that Atlas was unwilling to proceed without the Bid Protections.  Accordingly, by providing Bid Protections, the Subsidiary Debtors will be able to "lock in" Atlas' firm commitment to the transaction for the Denizen and, at this time, no other credible alternative prospective purchasers exist.  If unable to do so, the Subsidiary Debtors risk Atlas walking away from the transaction for the Denizen, which could have negative consequences for their estates.  Given the Subsidiary Debtors' need to consummate a value-maximizing transaction, their determination that the Atlas Bid represents such transaction following the Marketing and Sale Process, and their need to induce Atlas' ongoing commitment to the Sale pursuant to the Purchase Agreement, I believe that providing the Bid Protections in exchange for the certainty of Atlas' firm commitment is reasonable.

16.     Second, the Bid Protections will provide a floor for any alternative transaction proposal.  Although the Purchase Agreement contains a "no shop" provision, it also provides the Subsidiary Debtors with a standard "fiduciary out."  While the Subsidiary Debtors

10

have determined, in their business judgment, that the Sale to Atlas reflects a value-maximizing transaction, the Subsidiary Debtors will have the opportunity to consider alternative transaction proposals in accordance with their fiduciary duties. The Bid Protections will serve to set a floor for any alternative transaction proposal because such proposal will necessarily have to exceed Atlas' $506 million cash purchase price and the Bid Protections, thereby ensuring even more value for the Subsidiary Debtors' estates.

17.    Third, it is my opinion that the facts and circumstances of these Chapter 11 Cases justify the amount of the Bid Protections, which are within the range of bid protections offered in other cases I have seen throughout my career. As previously noted, the aggregate Bid Protections, including the Break-Up Fee and Expense Reimbursement, amount to approximately 3.98% percent of the cash portion of the purchase price. During my career, I have advised other prospective bidders, written into other bid procedure bankruptcy documents, and seen aggregate bid protections generally offered and approved within the range of 3.0% to 5.0% of the purchase price. It is my opinion that the amount of bid protections offered depend on the facts and circumstances of each particular case. As previously mentioned, I believe that the Sale to Atlas is the only viable proposal at this point in time and provides the certainty of what the Subsidiary Debtors have determined, in their business judgment, represents a value-maximizing transaction. Moreover, the Atlas Bid was the product of a Marketing and Sale Process that tested the market for a transaction for the Denizen. Accordingly, it is my professional opinion that the amount of the Bid Protections is justified by the facts and circumstances of these Chapter 11 Cases and is within the range of bid protections offered in other cases I have seen throughout my career.

11

18.    For these reasons, I believe that the Bid Protections are reasonable, designed to maximize value, and in the best interests of the Subsidiary Debtors' estates.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated:  September 14, 2021
      New York, New York               */s/ Jeffrey R. Manning, Sr.*
                                       Jeffrey R. Manning, Sr., CTP
                                       Managing Director
                                       CohnReznick  Capital Market Securities, LLC