WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Attorneys for the Initial Debtor and*
*Proposed Attorneys for the Subsidiary Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------X
                                       :
In re                                  :    Chapter 11
                                       :
EVERGREEN GARDENS MEZZ LLC, et al.,    :    Case No. 21-10335 (MG)
                                       :
            Debtors.¹                  :    (Jointly Administered)
                                       :    Related Docket Nos. 67 and 91
                                       :
-----------------------------------------------------------X
```

### SUPPLEMENT TO MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING SUBSIDIARY DEBTORS TO (A) PAY CERTAIN CRITICAL OPERATING EXPENSE CLAIMS, AND (B) HONOR TENANT OBLIGATIONS; AND (II) GRANTING RELATED RELIEF

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Evergreen Gardens Mezz LLC ("**EGM**"), together with Evergreen Gardens I LLC

("**EG I**") and Evergreen Gardens II LLC ("**EG II**" and, together with EG I, the "**Subsidiary**

**Debtors**" and, together with EGM, the "**Debtors**"), as debtors and debtors in possession in the

above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), respectfully submit the following

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Evergreen Gardens Mezz LLC (0416); Evergreen Gardens I LLC (2211); and Evergreen Gardens II LLC (6782). The Debtors' principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

supplement (the "**Supplement**") to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Subsidiary Debtors to (A) Pay Certain Critical Operating Expense Claims, and (B) Honor Tenant Obligations; and (II) Granting Related Relief*, dated September 14, 2021 [ECF No. 67] (the "**Critical Vendors Motion**") to (i) address certain outstanding issues and (ii) request additional relief in connection with the Critical Vendors Motion.[2]

1. On September 14, 2021, the Debtors filed the Critical Vendors Motion, in which they requested entry of interim and final orders (i) authorizing, but not directing, the Subsidiary Debtors (a) to pay the prepetition claims of certain vendors, suppliers, service providers, and other similar entities (the "**Critical Vendors**" and the prepetition claims of the Critical Vendors, the "**Critical Operating Expense Claims**") and (b) to continue to honor and perform their obligations under the leases with tenants of the Denizen, including, without limitation, to continue honoring obligations relating to tenant security deposits, and (ii) granting related relief. On September 15, 2021, following an interim hearing (the "**Interim Hearing**"), the Court entered the *Interim Order (I) Authorizing the Subsidiary Debtors to (A) Pay Certain Critical Operating Expense Claims, and (B) Honor Tenant Obligations; and (II) Granting Related Relief*, dated September 15, 2021 [ECF No. 91] (the "**Interim Order**"), which, among other things, granted, on an interim basis, the relief requested in the Critical Vendors Motion and scheduled a hearing for October 5, 2021 to consider the relief requested on a final basis (the "**Final Hearing**").

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Critical Vendors Motion or the *Joint Chapter 11 Plan of Evergreen Gardens I LLC, Evergreen Gardens II LLC, and Evergreen Gardens Mezz LLC*, dated September 13, 2021 [ECF No. 70] (as may be modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**"), as applicable.

## Update With Respect to Smart Management NY Inc.

2.       The Final Hearing has been adjourned indefinitely so as to allow the Debtors to supplement the record and provide additional information to the Court regarding Smart Management NY, Inc. (the "**Management Company**"), one of the proposed Critical Vendors.[3] Although the Interim Order authorized interim payments on account of the Management Company's Critical Operating Expense Claims, as of the date hereof, the Subsidiary Debtors have not yet made any payments to the Management Company on account of its prepetition claims.

3.       Since entry of the Interim Order, the Debtors have been in contact with multiple parties in interest, including, but not limited to, the Office of the U.S. Trustee (the "**U.S. Trustee**"), the trustee for the Debtors' senior, secured noteholders (the "**Series E Note Trustee**"), MREF REIT Lender 9 LLC (the "**Mezzanine Lender**"), ACI VI Denizen LLC and its affiliates (the "**Purchaser**"), and the Management Company, regarding the Critical Vendors Motion, Critical Operating Expense Claims, and related issues.  Such discussions have culminated in the Debtors' filing of the *Declaration of Israel David Friedman in Support of Motion Debtors for Entry of Interim and Final Orders (I) Authorizing Subsidiary Debtors to (A) Pay Certain Critical Operating Expense Claims, and (B) Honor Tenant Obligations; and (II) Granting Related Relief*, of even date herewith (the "**Friedman Declaration**"), the *Notice of Presentment of Stipulation and Order Allowing Claim of Smart Management NY, Inc.*, dated October 22, 2021 (the "**Management Company Stipulation**"), and this Supplement.

4.       The Friedman Declaration.  On October 22, 2021, the Debtors filed the Friedman Declaration, which provides, among other things, that: (i)  Mr. Yoel Goldman has no affiliation with, or economic interest in, the Management Company; (ii) Mr. Friedman previously

---

[3]     *See Notice of Cancellation of Zoom Hearing Scheduled for October 5, 2021 at 10:00 a.m.* [ECF No. 130].

co-owned the Management Company with Mr. Abraham Friedrich, but no longer has any equity interests in the Management Company; (iii) in the Spring of 2021, management of the day-to-day operations at the Denizen were transferred from AYM to the Management Company; (iv) Mr. Goldman does not receive, directly or indirectly, any portion of the monthly fees paid by the Subsidiary Debtors to the Management Company; and (v) neither Mr. Friedman nor Mr. Friedrich have any direct or indirect ownership interests in any of the Debtors or the Denizen.

5.      In discussions regarding execution of the Friedman Declaration, the Management Company raised its concern that the monthly management fees provided under the respective management agreements with the Subsidiary Debtors (collectively, the "**Management Agreements**")[4] was insufficient to compensate the Management Company for all the additional demands placed upon the Management Company as a result of the commencement of the Chapter 11 Cases and the impending sale to the Purchaser.  The Management Company advised the Subsidiary Debtors that it would not provide continuing services to the Subsidiary Debtors without receiving additional compensation therefor.  The Debtors believe that such continuing services are necessary to facilitate the efficient and orderly transition of the Denizen to the Purchaser and to avoid disruption in the day-to-day operations at the Denizen.  Given the different creditor constituencies at EG I and EG II, as well as the different prospects for payment of rejection damage claims, negotiations have resulted in one solution for EG I and a different solution for EG II.

---

[4]     On February 12, 2019, AYM and EG I entered into that certain Management Agreement regarding the management of the Denizen X, which was subsequently amended on January 2, 2020 (the "**EG I Management Agreement**").  On May 16, 2018, AYM, and EG II entered into that certain Management Agreement regarding the management of the Denizen Y (the "**EG II Management Agreement**").  Since the Management Company replaced AYM as the manager of the day-to-day operations at the Denizen, the Subsidiary Debtors and the Management Company have not entered into any new agreements and have operated pursuant to, and in accordance with the terms of, the existing Management Agreements.

6.      The Management Company Stipulation.  With respect to EG I, the parties have agreed, subject to the Court's approval, to enter into the Management Company Stipulation. Among other things, the Management Company Stipulation provides for: (i) the rejection of the EG I Management Agreement as of the Effective Date of the Plan; (ii) the allowance of the Management Company's rejection damage claim, calculated based upon a prescribed formula; (iii) the allowance of the Management Company's claim, if any, for unpaid amounts due under the EG I Management Agreement at the monthly contract rate for the period from August 1, 2021 until the Subsidiary Debtor Petition Date, in an amount not to exceed $73,788; and (iv) an administrative expense claim for unpaid amounts due under the EG I Management Agreement for the period from the Subsidiary Debtor Petition Date through the Effective Date.  As reflected in the Management Company Stipulation, the Mezzanine Lender, which is the entity with the residual interest in all funds upstreamed to EGM from EG I under the Plan, has consented to the allowance of the Management Company's rejection damage claim upon the terms set forth in the Management Company Stipulation. The Management Company Stipulation is scheduled for presentment for the Court on November 1, 2021 at 10:00 a.m. (Eastern Time).

7.      Additional Management Company Fee.  EG II has agreed, subject to the Court's approval, to pay the Management Company an additional $100,000 as an additional fee (the "**Additional Management Company Fee**") for the period concluding on the Effective Date of the Plan.  EG II's payment of the Additional Management Company Fee will be prorated over the last two weeks of September and the months of October and November, 2021.  The Series E Noteholders, whose share of the proceeds from the Sale Transaction will be used to fund the Additional Management Company Fee, have consented to EG II's payment of the Additional Management Company Fee.  Based on the foregoing, and in light of the facts and circumstances

of these Chapter 11 Cases, the Debtors believe that payment of the Additional Management Company Fee is necessary, appropriate, and reasonable.

8.     <u>Purchaser Consulting Agreement</u>.  The final element of the treatment of the Management Company is the agreement by the Purchaser to pay the Management Company a consulting fee in the amount of $50,000 for post-Effective Date consulting services.  That arrangement is between the Purchaser and the Management Company, and the Debtors are not parties to those agreements.

**Additional Critical Operating Expense Claims**

9.     In the Critical Vendors Motion, the Debtors requested authority to pay the following representative categories and approximate amounts of the Critical Operating Expense Claims on an interim and final basis, subject to and in accordance with the terms of the Financing Documents and Orders:

| Critical Vendor Category | Amount |
|---|---|
| Management Company | $100,430 |
| Building Staff | $174,402 |
| Other Critical Vendors | $41,290 |
| **Total Estimated Critical Operating Expense Claims:** | **$316,122** |

10.    The amounts set forth in the above table reflect Critical Operating Expense Claims in the amount of $163,750 for EG I and $152,372 for EG II, totaling $316,122 (the "**Vendor Cap Amount**").

11.    After further examination of their books and records, the Subsidiary Debtors have determined that they underestimated the amount of Critical Operating Expense Claims owed to Critical Vendors.  Specifically, in several instances, bills that related to the prepetition period had not been invoiced as of the Subsidiary Debtor Petition Date and were inadvertently omitted.  For example, the monthly management fee payable to the Management

Company is payable in arrears on the first of each month. Thus, the amount due to the Management Company on October 1st included the first thirteen days of September, which represents a prepetition claim that cannot be paid absent Court approval but was not included in the Vendor Cap Amount. Similar omissions were made with respect to other Critical Vendors.

12.     Accordingly, the Debtors request authorization to pay on a final basis the Critical Operating Expense Claims in the revised amounts set forth below:

| Critical Vendor Category | Approx. Amount Sought to Pay in Critical Vendor Motion | Revised Approx. Amount Seeking Authority to Pay on a Final Basis |
|---|---|---|
| Management Company | $100,430.00 | $143,949.67 |
| Building Staff | $174,401.68 | $253,805.04 |
| Other Critical Vendors | $41,290.05 | $68,006.25 |
| Total Estimated Critical Operating Expense Claims: | $316,121.73 | $465,760.96 |

13.     As set forth in the table above, the Debtors request authority to increase the amount of Critical Operating Expense Claims paid on a final basis by (i) $43,519.67 to the Management Company, (ii) $79,403.36 to Building Staff, and (iii) $26,716.20 to Other Critical Vendors, for an aggregate of $465,760.96 (the "**Revised Vendor Cap Amount**"). Of the increases contemplated in the Revised Vendor Cap Amount, EG I and EG II will pay approximately $78,049.89 and $71,589.34, respectively.

14.     The Debtors' debtor-in-possession financing lender, MREF REIT LENDER 15 LLC, as well as the Mezzanine Lender and the Series E Notes Trustee, on behalf of the Series E Noteholders, have each consented to the Revised Vendor Cap Amount. Based on the foregoing and to avoid disruption to the ongoing day-to-day operations at the Denizen, the Debtors believe that payment of the Critical Operating Expense Claims up to the Revised Vendor Cap amount is appropriate and necessary.

## Conclusion

15.     For all of the foregoing reasons, the Debtors request entry of the attached proposed order (a) providing for a Revised Critical Vendor Cap Amount of $465,760.96, (b) authorizing EG II to pay the Additional Management Company Fee, and (c) granting the Debtors such other and further relief as is just.   A revised proposed order granting the relief requested in the Critical Vendors Motion, as supplemented hereby, is attached hereto as **Exhibit A** (the "**Proposed Order**").   A blacklined copy of the Proposed Order, which reflects changes from the Interim Order, is annexed hereto as **Exhibit B**.

WHEREFORE the Debtors respectfully request entry of the Proposed Order and such other and further relief as the Court may deem just and appropriate.

Dated:  October 22, 2021
        New York, New York

*/s/ Matthew P. Goren*                                    
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Attorneys for the Initial Debtor and*
*Proposed Attorneys for the Subsidiary Debtors*

## Exhibit A

**Revised Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                          :
In re                         :     **Chapter 11**
                          :
**EVERGREEN GARDENS MEZZ LLC,** *et al.,*  :     **Case No. 21-10335 (MG)**
                          :
            **Debtors.**[1]         :     **(Jointly Administered)**
                          :
------------------------------------------------------------X

### FINAL ORDER (I) AUTHORIZING SUBSIDIARY DEBTORS TO (A) PAY CERTAIN CRITICAL OPERATING EXPENSE CLAIMS, AND (B) HONOR TENANT OBLIGATIONS; AND (II) GRANTING RELATED RELIEF

Upon the motion, dated September 14, 2021 [ECF No. 67] (the "**Motion**"),[2] of

Evergreen Gardens Mezz LLC ("**EGM**"), together with Evergreen Gardens I LLC ("**EG I**") and

Evergreen Gardens II LLC ("**EG II**" and, together with EG I, the "**Subsidiary Debtors**" and,

together with EGM, the "**Debtors**"), as debtors and debtors in possession in the above-captioned

chapter 11 cases (the "**Chapter 11 Cases**"), pursuant to sections 363(b) and 105(a) of the title 11

of the United States Code (the "**Bankruptcy Code**"), Rules 6003 and 6004 of the Federal Rules

of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9013-1 of the Local Bankruptcy

Rules for the Southern District of New York (the "**Local Bankruptcy Rules**") for entry of interim

and final orders (i) authorizing, but not directing, the Subsidiary Debtors to (a) pay the prepetition

claims of certain vendors, suppliers, service providers, and other similar entities (the "**Critical

Vendors**" and the prepetition claims of the Critical Vendors, the "**Critical Operating Expense**

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Evergreen Gardens Mezz LLC (0416); Evergreen Gardens I LLC (2211); and Evergreen Gardens II LLC (6782). The Debtors' principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion, the Supplement, or the *Joint Chapter 11 Plan of Evergreen Gardens I LLC, Evergreen Gardens II LLC, and Evergreen Gardens Mezz LLC,* dated September 13, 2021 [ECF No. 70] (as may be modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**"), as applicable.

Claims") that are essential to maintaining the operations of the Denizen and the going concern value of the Subsidiary Debtors' businesses, and (b) to continue to honor and perform their obligations under the leases with tenants of the Denizen, including, without limitation, to continue honoring obligations relating to tenant security deposits (the "**Tenant Obligations**"), and (ii) granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and due and proper notice of the relief requested in the Motion having been provided to the Notice Parties, and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Motion on an interim basis; and the Court having entered an order approving the Motion on an interim basis [ECF No. 91]; and upon the Ravid Declaration, filed contemporaneously with the Motion, the declaration of Israel David Friedman, dated October 22, 2021 [ECF No. 168], and the *Supplement to Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Subsidiary Debtors to (A) Pay Certain Critical Operating Expense Claims, and (B) Honor Tenant Obligations; and (II) Granting Related Relief*, dated October 22, 2021 [ECF No.___] (the "**Supplement**"); and no responses or objections to final approval of the relief requested in the Motion or the Supplement having been filed or received by the Debtors; and the Court having held a hearing to consider the relief requested in the Motion and Supplement on a final basis (the "**Final Hearing**"); and upon the record of the Final Hearing; and the Court having determined that the legal and factual bases set forth in the Motion and the Supplement establish just cause for the relief granted herein; and it appearing that the relief

requested in the Motion and the Supplement is in the best interests of the Subsidiary Debtors, their

estates, creditors, and all parties in interest; and upon all of the proceedings had before the Court

and after due deliberation and sufficient cause appearing therefor,

## IT IS HEREBY ORDERED THAT

1. The Motion is granted on a final basis to the extent set forth herein.

2. Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the
Subsidiary Debtors are authorized, but not directed, in the reasonable exercise of their business
judgment, to pay some or all of the Critical Operating Expense Claims (or to direct the
Management Company to pay such amounts on behalf of the Subsidiary Debtors) in a manner
consistent with their prepetition practices up to the Revised Vendor Cap Amount of $465,760.96.

3. Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the
Subsidiary Debtors are authorized, but not directed, in the reasonable exercise of their business
judgment, to continue to honor and pay Tenant Obligations (or to direct the Management Company
to pay such amounts on behalf of the Subsidiary Debtors) during the Chapter 11 Cases.

4. The Subsidiary Debtors shall undertake all appropriate efforts to cause
Critical Vendors to enter into an agreement (the "**Vendor Agreement**") with the Subsidiary
Debtors, substantially in the form of the agreement annexed hereto as **Exhibit 1**, upon "Customary
Trade Terms." As used herein, "Customary Trade Terms" means industry trade terms and existing
contractual obligations between the parties, including rebates and discounts, and shall in no event
be worse than the most favorable terms and credit limits in effect within the two (2) years before
the Subsidiary Debtor Petition Date, or such other trade terms as agreed by the Subsidiary Debtors
and the Critical Vendor.

5.      The Subsidiary Debtors are authorized, but not required, to enter into Vendor Agreements when the Subsidiary Debtors determine, in the exercise of their reasonable business judgment, that it is appropriate to do so; *provided that* the Subsidiary Debtors' inability to enter into a Vendor Agreement shall not preclude them from paying a Critical Operating Expense Claim when, in the exercise of their reasonable business judgment, such payment is necessary to preserve the going concern value of the Subsidiary Debtors.

6.      As a condition to receiving payment of a Critical Operating Expense Claim, a Critical Vendor must agree to take all necessary actions to remove any such Trade Lien at the Critical Vendor's sole expense to the extent such Critical Vendor holds a Trade Lien on account of such Critical Operating Expense Claim.

7.      If a Critical Vendor has received payment of its Critical Operating Expense Claim and later refuses to continue supplying goods or services for the applicable period in compliance with the Vendor Agreement, this Final Order, or such terms as were individually agreed to between the Subsidiary Debtors and such Critical Vendor, the Subsidiary Debtors may, in their discretion, declare that (i) the payment of the Critical Operating Expense Claim is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Subsidiary Debtors may recover in cash or in goods from such Critical Vendor (including by setoff against postpetition obligations); or (ii) the Critical Vendor shall immediately return the payment of its Critical Operating Expense Claim without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever, and the Critical Operating Expense Claim shall be reinstated in such an amount so as to restore the Debtors and the Critical Vendor to their original positions as if the Vendor Agreement had never been entered into and no payment of the Critical Operating Expense Claim had been made.

8.      The Subsidiary Debtors shall maintain a matrix summarizing (i) the name of each Critical Vendor paid; (ii) the amount paid to each vendor for its Critical Operating Expense Claim; and (iii) the type of goods or services provided by each Critical Vendor.  This matrix shall be provided (a) upon request, to the U.S. Trustee, and (b) on a weekly basis (or such other agreed upon time period), to counsel for the Series E Note Trustee and the Mezzanine Lender, and any professionals retained by any statutory committee of unsecured creditors appointed in these chapter 11 cases; *provided that* the professionals for any statutory committee of creditors shall keep the matrix confidential and shall not disclose any of the information in the matrix to anyone, including, but not limited to, any member of any statutory committee of creditors, without prior written consent of the Subsidiary Debtors.

9.      EG II is hereby authorized to pay the Management Company the Additional Management Company Fee for the period concluding on the Effective Date of the Plan.  The Additional Management Company Fee shall be in addition to the contractual fee payable to the Management Company for the period after the Subsidiary Debtor Petition Date through the Effective Date of the Plan under the EG II Management Agreement.

10.      Notwithstanding anything to the contrary contained herein, (i) any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the Subsidiary Debtors under their postpetition financing agreements (the "**DIP Documents**") and any orders approving the DIP Documents and governing the Subsidiary Debtors' use of cash collateral (including with respect to any budgets governing or relating thereto) and (ii) to the extent there is any inconsistency between the terms of such orders approving the DIP Documents or the Subsidiary Debtors' use of cash collateral and any action taken or proposed to be taken hereunder, the terms of such orders approving the DIP Documents and use of cash collateral shall control.

11.    Applicable banks and financial institutions are authorized, but not directed, at the Subsidiary Debtors' request, to receive, process, honor and pay, to the extent of funds on deposit, any and all checks issued or to be issued or electronic fund transfers requested or to be requested by the Management Company, on the Subsidiary Debtors' behalf, relating to the Critical Operating Expenses and the Tenant Obligations.

12.    Nothing contained in the Motion, the Supplement, or this Final Order, nor any payment made pursuant to the authority granted by this Final Order, is intended to be or shall be construed as (i) a waiver of any claims or causes of action which may exist against any creditor or interest holder, or (ii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

13.    Under the circumstances of these Chapter 11 Cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

14.    Notwithstanding Bankruptcy Rule 6004(h), this Final Order shall be immediately effective and enforceable upon its entry.

15.    The Subsidiary Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order.

16.    The Court shall retain jurisdiction to hear and determine all maters arising from or related to the implementation, interpretation, and/or enforcement of this Final Order.


Dated: _____, 2021
           New York, New York

                                          _____
                                          HONORABLE MARTIN GLENN
                                          UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

**Form of Vendor Agreement**

## Vendor Agreement

The Subsidiary Debtors (as defined below) and **[_____]** ("**Vendor**") hereby enter into the following vendor agreement (this "**Vendor Agreement**") dated as of this **[___], 2021**.

## Recitals

WHEREAS, on September 14, 2021 (the "**Subsidiary Debtor Petition Date**"), Evergreen Gardens I LLC ("**EG I**") and Evergreen Gardens II LLC ("**EG II**" and, together with EG I, "**Subsidiary Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Court**").

WHEREAS, on November [___], 2021, the Court entered the *Final Order (I) Authorizing Subsidiary Debtors to (A) Pay Certain Critical Operating Expense Claims, and (B) Honor Tenant Obligations; and (II) Granting Related Relief* (ECF No. [____]) (the "**Final Critical Vendor Order**") authorizing the Debtors, under certain conditions, to pay the prepetition claims of certain vendors, including Vendor, subject to the terms and conditions set forth therein.

WHEREAS, pursuant to the Final Critical Vendor Order, to receive payment on account of prepetition claims, each Critical Vendor (as defined in the Final Critical Vendor Order) must agree to continue to supply goods or services to the Debtors on "Customary Trade Terms." As used herein and in the Final Critical Vendor Order, "Customary Trade Terms" means industry trade terms and existing contractual obligations between the Parties, including rebates and discounts, and shall in no event be worse than the most favorable terms and credit limits in effect within the two (2) years before the Subsidiary Debtor Petition Date, or such other trade terms as agreed by the Subsidiary Debtors and the Vendor.

WHEREAS, the Subsidiary Debtors and Vendor (collectively, the "**Parties**") agree to the following terms as a condition of payment on account of certain prepetition claims Vendor may hold against the Subsidiary Debtors.

### Agreement

1.     The Parties hereby agree that Vendor is a "Critical Vendor" (as defined in the Final Critical Vendor Order).

2.     The balance of Vendor's aggregate prepetition claim(s) against the Debtors is $[__] (the "**Agreed Critical Operating Expense Claim**").

3.     Following execution of this Vendor Agreement, the Debtors will pay Vendor $[__] (the "**Payment Amount**") in full satisfaction of the Agreed Critical Operating Expense Claim. The Payment Amount will be paid pursuant to the Customary Trade Terms set forth below, and will be applied to any invoices previously received by the Debtors on account of the Agreed Critical Operating Expense Claim.

4.     For a period from the date this Vendor Agreement is executed until the earlier of (a) the effective date of a chapter 11 plan for the Debtors and (b) two (2) years from the date of this Vendor Agreement, Vendor shall supply goods **[and/or]** services to the Debtors based on the following Customary Trade Terms: _____.

5.     The Parties further agree, acknowledge and represent that:

   a.     the Parties have reviewed the terms and provisions of the Final Critical Vendor Order and consent to be bound by such terms and that this Vendor Agreement is expressly subject to the Final Critical Vendor Order;

   b.     any payments made on account of the Agreed Critical Operating Expense Claim shall be subject to the terms and conditions of the Final Critical Vendor Order;

   c.     if Vendor refuses to supply goods or services to the Debtors as provided herein or otherwise fails to perform any of their obligations hereunder, the

Subsidiary Debtors may exercise all rights and remedies available under the Final Critical Vendor Order, the Bankruptcy Code, or applicable law;

d.  Vendor will not separately seek payment for any claims pursuant to section 503(b)(9) of the Bankruptcy Code or other similar claims outside of the terms of the Final Critical Vendor Order or this Vendor Agreement unless Vendor's participation in the vendor payment program authorized by the Final Critical Vendor Order is terminated;

e.  in consideration for receiving the Payment Amount, Vendor shall not file or otherwise assert against the Subsidiary Debtors, their estates, or any other person or entity, or any of their respective assets or property (real or personal) any lien (regardless of the statute or other legal authority upon which the lien is asserted) related to any remaining prepetition amounts allegedly owed to Vendor by the Subsidiary Debtors arising from agreements entered into before the Commencement Date. Furthermore, if Vendor has taken steps to file or assert a lien before entering into this Vendor Agreement, Vendor agrees to take all necessary steps to remove the lien as soon as possible at its sole cost and expense;

f.  if Vendor fails to comply with the terms and provisions of this Vendor Agreement, the Subsidiary Debtors may, in their discretion, and without further order of the Bankruptcy Court, declare (i) the payment of the Payment Amount, as the case may be, is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Subsidiary Debtors may recover from the Vendor in cash or in goods (including by setoff against postpetition obligations); or (ii) the Vendor shall immediately return the Subsidiary Debtors' payment of its Payment Amount without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever, and the Critical Operating Expense Claim (as defined in the Final Critical Vendor Order) shall be reinstated in an amount that will restore the Subsidiary Debtors and the Vendor to their original positions as if the Vendor Agreement had never been entered into and the payment of the Critical Operating Expense Claim had not been made;

g.  if Vendor fails to comply with the terms and provisions of this Vendor Agreement, the Subsidiary Debtors may, in their discretion, declare that such Vendor Agreement has terminated; provided that the Vendor Agreement may be reinstated if:

i.  after notice and a hearing (following a motion filed by the respective Vendor), the Bankruptcy Court reverses the Subsidiary Debtors' decision to terminate the Vendor Agreement for good cause shown that the Subsidiary Debtors' determination was materially incorrect;

3

    ii.    the Vendor fully cures the underlying default of the Vendor Agreement within five (5) business days from the date of receipt of notice of termination of the Vendor Agreement; or

    iii.    the Subsidiary Debtors, in their sole discretion, reach a commercially acceptable agreement with the breaching party;

    h.    the Parties hereby submit to the exclusive jurisdiction of the Court to resolve any dispute arising under or in connection with this Vendor Agreement.

6.    Subject to the requirements of the Bankruptcy Code, further orders of the Court, or applicable law, and unless it otherwise becomes public without a breach of this Vendor Agreement, Vendor agrees to hold in confidence and not disclose to any party:  (a) any and all payments made by the Subsidiary Debtors pursuant to this Vendor Agreement; (b) the terms of payment set forth herein; and (c) the Customary Trade Terms (collectively, the "**Confidential Information**"); provided that if any party seeks to compel Vendor's disclosure of any or all of the Confidential Information, through judicial action or otherwise, or Vendor intends to disclose any or all of the Confidential Information, Vendor shall immediately provide the Subsidiary Debtors with prompt written notice so that the Subsidiary Debtors may seek an injunction, protective order or any other available remedy to prevent such disclosure; provided, further, that if such remedy is not obtained, Vendor shall furnish only such information as Vendor is legally required to provide.

7.    The undersigned hereby represent and warrant that:  (a) they have full authority to execute this Vendor Agreement on behalf of the respective Parties; (b) the respective Parties have full knowledge of, and have consented to, this Vendor Agreement; and (c) they are fully authorized to bind the Party to all of the terms and conditions of this Vendor Agreement.

8.    This Vendor Agreement sets forth the entire understanding of the Parties regarding the subject matter hereof and supersedes all prior oral or written agreements between them.  This Vendor Agreement may not be changed, modified, amended or supplemented, except in a writing signed by both Parties.

9.      This Vendor Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.  Signatures by facsimile or electronic signatures shall count as original signatures for all purposes.

AGREED AND ACCEPTED AS OF THE DATE SET FORTH ABOVE:

**[SUBSIDIARY DEBTOR]**                    **[VENDOR]**

_____          _____

**<u>Exhibit B</u>**

**Blackline**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X
-

|   |   |   |
|---|---|---|
| In re | : | **Chapter 11** |
|   | : |   |
| **EVERGREEN GARDENS MEZZ LLC,** *et al.*, | : | **Case No. 21-10335 (MG)** |
|   | : |   |
| Debtors.[1] | : | **(Jointly Administrationered Pending)** |
|   | : |   |

-------------------------------------------------------------- X
-

**~~INTERIM~~FINAL ORDER (I) AUTHORIZING SUBSIDIARY DEBTORS
TO (A) PAY CERTAIN CRITICAL OPERATING EXPENSE CLAIMS, AND
(B) HONOR TENANT OBLIGATIONS; AND (II) GRANTING RELATED RELIEF**

Upon the motion ~~(the "Motion"),[2]~~, dated September 14, 2021 [ECF No. 67] (the

"**Motion**"),[2] of Evergreen Gardens Mezz LLC ("**EGM**" ~~or the "Initial Debtor"~~), together with

Evergreen Gardens I LLC ("**EG I**") and Evergreen Gardens II LLC ("**EG II**" and, together with

EG I, the "**Subsidiary Debtors**" and, together with ~~the Initial Debtor~~EGM, the "**Debtors**"), as

debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Chapter 11**

**Cases**"), pursuant to sections 363(b) and 105(a) of the title 11 of the United States Code

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Evergreen Gardens Mezz LLC (0416); Evergreen Gardens I LLC (2211); and Evergreen Gardens II LLC (6782).  The Debtors' principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

[2]    ~~Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.~~

[2]    *Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion, the Supplement, or the Joint Chapter 11 Plan of Evergreen Gardens I LLC, Evergreen Gardens II LLC, and Evergreen Gardens Mezz LLC, dated September 13, 2021 [ECF No. 70] (as may be modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "Plan"), as applicable.*

(the "**Bankruptcy Code**"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**") for entry of interim and final orders (i) authorizing, but not directing, the Subsidiary Debtors to (a) pay the prepetition claims of certain vendors, suppliers, service providers, and other similar entities (the "**Critical Vendors**" and the prepetition claims of the Critical Vendors, the "**Critical Operating Expense Claims**") that are essential to maintaining the operations of the Denizen and the going concern value of the Subsidiary Debtors' businesses, and (b) to continue to honor and perform their obligations under the leases with tenants of the Denizen, including, without limitation, to continue honoring obligations relating to tenant security deposits (the "**Tenant Obligations**"), and (ii) granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and due and proper notice of the relief requested in the Motion having been provided to the Notice Parties, and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion held a hearing to consider the relief requested in the Motion on an interim basis; and the Court having entered an order approving the Motion on an interim basis [ECF No. 91]; and upon the Ravid Declaration, filed contemporaneously with the Motion, the declaration of Israel David Friedman, dated October 22, 2021 [ECF No. 168], and the

2

*Supplement to Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Subsidiary Debtors to (A) Pay Certain Critical Operating Expense Claims, and (B) Honor Tenant Obligations; and (II) Granting Related Relief,* dated October 22, 2021 [ECF No.___] (the "**Supplement**"); and no responses or objections to final approval of the relief requested in the Motion or the Supplement having been filed or received by the Debtors; and the Court having held a hearing to consider the relief requested in the Motion ~~on an interim~~and Supplement on a final basis (the "**Final** Hearing"); and upon the ~~Ravid Declaration, filed contemporaneously with the Motion, and the~~ record of the Final Hearing; and the Court having determined that the legal and factual bases set forth in the Motion and the Supplement establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion ~~is necessary to avoid immediate and irreparable harm to the Subsidiary Debtors and their estates as contemplated by Bankruptcy Rule 6003, and~~and the Supplement is in the best interests of the Subsidiary Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

## IT IS HEREBY ORDERED THAT

1.    The Motion is granted on ~~an interim~~a final basis to the extent set forth herein.

2.    Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Subsidiary Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay some or all of the Critical Operating Expense Claims (or to direct the

3

Management Company to pay such amounts on behalf of the Subsidiary Debtors) in a manner consistent with their prepetition practices up to the Revised Vendor Cap Amount of $465,760.96.

3.    Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Subsidiary Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to continue to honor and pay Tenant Obligations (or to direct the Management Company to pay such amounts on behalf of the Subsidiary Debtors) during the Chapter 11 Cases.

4.    The Subsidiary Debtors shall undertake all appropriate efforts to cause Critical Vendors to enter into an agreement (the "**Vendor Agreement**") with the Subsidiary Debtors, substantially in the form of the agreement annexed hereto as **Exhibit 1**, upon "Customary Trade Terms."  As used herein, "Customary Trade Terms" means industry trade terms and existing contractual obligations between the parties, including rebates and discounts, and shall in no event be worse than the most favorable terms and credit limits in effect within the two (2) years before the Subsidiary Debtor Petition Date, or such other trade terms as agreed by the Subsidiary Debtors and the Critical Vendor.

5.    The Subsidiary Debtors are authorized, but not required, to enter into Vendor Agreements when the Subsidiary Debtors determine, in the exercise of their reasonable business judgment, that it is appropriate to do so; *provided that* the Subsidiary Debtors' inability to enter into a Vendor Agreement shall not preclude them from paying a Critical Operating

Expense Claim when, in the exercise of their reasonable business judgment, such payment is necessary to preserve the going concern value of the Subsidiary Debtors.

6.      As a condition to receiving payment of a Critical Operating Expense Claim, a Critical Vendor must agree to take all necessary actions to remove any such Trade Lien at the Critical Vendor's sole expense to the extent such Critical Vendor holds a Trade Lien on account of such Critical Operating Expense Claim.

7.      If a Critical Vendor has received payment of its Critical Operating Expense Claim and later refuses to continue supplying goods or services for the applicable period in compliance with the Vendor Agreement, this ~~Interim~~Final Order, or such terms as were individually agreed to between the Subsidiary Debtors and such Critical Vendor, the Subsidiary Debtors may, in their discretion, declare that (i) the payment of the Critical Operating Expense Claim is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Subsidiary Debtors may recover in cash or in goods from such Critical Vendor (including by setoff against postpetition obligations); or (ii) the Critical Vendor shall immediately return the payment of its Critical Operating Expense Claim without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever, and the Critical Operating Expense Claim shall be reinstated in such an amount so as to restore the Debtors and the Critical Vendor to their original positions as if the Vendor Agreement had never been entered into and no payment of the Critical Operating Expense Claim had been made.

~~8.      If a Critical Vendor is later determined to be an "insider," as defined by section 101(31) of the Bankruptcy Code, and such Critical Vendor has received any payment on account~~

5

of a Critical Operating Expense Claim pursuant to this Interim Order, (i) such Critical Vendor shall immediately return any and all payments made on account of its Critical Operating Expense Claim without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever, and the Critical Operating Expense Claim shall be reinstated in such an amount so as to restore the Debtors and the Critical Vendor to their original positions as if no payments on account of the Critical Operating Expense Claim had been made; or (ii) the payment of the Critical Operating Expense Claim shall be deemed a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Subsidiary Debtors may recover in cash or in goods from such Critical Vendor (including by setoff against postpetition obligations).

8.   9.   The Subsidiary Debtors shall maintain a matrix summarizing (i) the name of each Critical Vendor paid; (ii) the amount paid to each vendor for its Critical Operating Expense Claim; and (iii) the type of goods or services provided by each Critical Vendor.  This matrix shall be provided (a) upon request, to the U.S. Trustee, and (b) on a weekly basis (or such other agreed upon time period), to counsel for the Series E Note Trustee and the Mezzanine Lender, and any professionals retained by any statutory committee of unsecured creditors appointed in these chapter 11 cases; *provided that* the professionals for any statutory committee of creditors shall keep the matrix confidential and shall not disclose any of the information in the matrix to anyone, including, but not limited to, any member of any statutory committee of creditors, without prior written consent of the Subsidiary Debtors.

9.    EG II is hereby authorized to pay the Management Company the Additional Management Company Fee for the period concluding on the Effective Date of the Plan.  The Additional Management Company Fee shall be in addition to the contractual fee payable to the Management Company for the period after the Subsidiary Debtor Petition Date through the Effective Date of the Plan under the EG II Management Agreement.

10.    Notwithstanding anything to the contrary contained herein, (i) any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the Subsidiary Debtors under their postpetition financing agreements (the "**DIP Documents**") and any orders approving the DIP Documents and governing the Subsidiary Debtors' use of cash collateral (including with respect to any budgets governing or relating thereto) and (ii) to the extent there is any inconsistency between the terms of such orders approving the DIP Documents or the Subsidiary Debtors' use of cash collateral and any action taken or proposed to be taken hereunder, the terms of such orders approving the DIP Documents and use of cash collateral shall control.

11. Nothing in the Motion or this Interim Order shall be deemed to authorize the Subsidiary Debtors to accelerate any payments not otherwise due prior to the date of the hearing to consider entry of an order granting the relief requested in the Motion on a final basis (the "Final Hearing").

11.    12. Applicable banks and financial institutions are authorized, but not directed, at the Subsidiary Debtors' request, to receive, process, honor and pay, to the extent of funds on deposit, any and all checks issued or to be issued or electronic fund transfers requested

7

or to be requested by the Management Company, on the Subsidiary Debtors' behalf, relating to the Critical Operating Expenses and the Tenant Obligations.

13. The Final Hearing on the Motion shall be held **on October 5, 2021, at 10:00 a.m. (Prevailing Eastern Time)** and any objections or responses to the Motion shall be in writing, filed with the Court, and served upon (i) the attorneys for the Initial Debtor and the proposed attorneys for the Subsidiary Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Gary T. Holtzer and Matthew P. Goren); and (ii) the Notice Parties, in each case so as to be received no later than **4:00 p.m. (Prevailing Eastern Time) on September 28, 2021**.

12.    14. Nothing contained in the Motion, the Supplement, or this Interim Final Order, nor any payment made pursuant to the authority granted by this Interim Final Order, is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors, (iii) a waiver of any claims or causes of action which may exist against any creditor or interest holder, or (iv ii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

15. Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

16. Under the circumstances of theses Chapter 11 Cases, the requirements of Bankruptcy Rule 6003 are satisfied.

8

13. ~~17.~~ Under the circumstances of these Chapter 11 Cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

14. ~~18.~~ Notwithstanding Bankruptcy Rule 6004(h), this ~~Interim~~Final Order shall be immediately effective and enforceable upon its entry.

15. ~~19.~~ The Subsidiary Debtors are authorized to take all actions necessary to effectuate the relief granted in this ~~Interim~~Final Order.

16. ~~20.~~ The Court shall retain jurisdiction to hear and determine all maters arising from or related to the implementation, interpretation, and/or enforcement of this ~~Interim~~Final Order.

Dated: _____, 2021
        New York, New York

_____
HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

9

## Exhibit 1

**Form of Vendor Agreement**

## Vendor Agreement

The Subsidiary Debtors (as defined below) and **[_____]** ("**Vendor**") hereby enter into the following vendor agreement (this "**Vendor Agreement**") dated as of this **[___], 2021**.

## Recitals

WHEREAS, on September 14, 2021 (the "**Subsidiary Debtor Petition Date**"), Evergreen Gardens I LLC ("**EG I**") and Evergreen Gardens II LLC ("**EG II**" and, together with EG I, "**Subsidiary Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Court**").

WHEREAS, on ~~September~~November [___], 2021, the Court entered the *~~Interim~~Final Order (I) Authorizing Subsidiary Debtors to (A) Pay Certain Critical Operating Expense Claims, and (B) Honor Tenant Obligations; and (II) Granting Related Relief* (ECF No. [____]) (the "~~**Interim**~~**Final** **Critical Vendor Order**") authorizing the Debtors, under certain conditions, to pay the prepetition claims of certain vendors, including Vendor, subject to the terms and conditions set forth therein.

WHEREAS, pursuant to the ~~Interim~~Final Critical Vendor Order, to receive payment on account of prepetition claims, each Critical Vendor (as defined in the ~~Interim~~Final Critical Vendor Order) must agree to continue to supply goods or services to the Debtors on "Customary Trade Terms." As used herein and in the ~~Interim~~Final Critical Vendor Order, "Customary Trade Terms" means industry trade terms and existing contractual obligations between the Parties, including rebates and discounts, and shall in no event be worse

than the most favorable terms and credit limits in effect within the two (2) years before the Subsidiary Debtor Petition Date, or such other trade terms as agreed by the Subsidiary Debtors and the Vendor.

WHEREAS, the Subsidiary Debtors and Vendor (collectively, the "**Parties**") agree to the following terms as a condition of payment on account of certain prepetition claims Vendor may hold against the Subsidiary Debtors.

## Agreement

1.      The Parties hereby agree that Vendor is a "Critical Vendor" (as defined in the ~~Interim~~Final Critical Vendor Order).

2.      The balance of Vendor's aggregate prepetition claim(s) against the Debtors is $[__] (the "**Agreed Critical Operating Expense Claim**").

3.      Following execution of this Vendor Agreement, the Debtors will pay Vendor $[__] (the "**Payment Amount**") in full satisfaction of the Agreed Critical Operating Expense Claim.  The Payment Amount will be paid pursuant to the Customary Trade Terms set forth below, and will be applied to any invoices previously received by the Debtors on account of the Agreed Critical Operating Expense Claim.

4.      For a period from the date this Vendor Agreement is executed until the earlier of (a) the effective date of a chapter 11 plan for the Debtors and (b) two (2) years from the date of this Vendor Agreement, Vendor shall supply goods **[and/or]** services to the Debtors based on the following Customary Trade Terms: _____.

5.      The Parties further agree, acknowledge and represent that:

a.      the Parties have reviewed the terms and provisions of the ~~Interim~~Final Critical Vendor Order and consent to be bound by such terms and that this

2

Vendor Agreement is expressly subject to the ~~Interim~~Final Critical Vendor Order;

b.    any payments made on account of the Agreed Critical Operating Expense Claim shall be subject to the terms and conditions of the ~~Interim~~Final Critical Vendor Order~~, including any orders of the Court granting the relief requested in the Interim Critical Vendor Order on a final basis, as applicable~~;

c.    if Vendor refuses to supply goods or services to the Debtors as provided herein or otherwise fails to perform any of their obligations hereunder, the Subsidiary Debtors may exercise all rights and remedies available under the ~~Interim~~Final Critical Vendor Order, the Bankruptcy Code, or applicable law;

d.    Vendor will not separately seek payment for any claims pursuant to section 503(b)(9) of the Bankruptcy Code or other similar claims outside of the terms of the ~~Interim~~Final Critical Vendor Order or this Vendor Agreement unless Vendor's participation in the vendor payment program authorized by the ~~Interim~~Final Critical Vendor Order is terminated;

e.    in consideration for receiving the Payment Amount, Vendor shall not file or otherwise assert against the Subsidiary Debtors, their estates, or any other person or entity, or any of their respective assets or property (real or personal) any lien (regardless of the statute or other legal authority upon which the lien is asserted) related to any remaining prepetition amounts allegedly owed to Vendor by the Subsidiary Debtors arising from agreements entered into before the Commencement Date.  Furthermore, if Vendor has taken steps to file or assert a lien before entering into this Vendor Agreement, Vendor agrees to take all necessary steps to remove the lien as soon as possible at its sole cost and expense;

f.    if Vendor fails to comply with the terms and provisions of this Vendor Agreement, the Subsidiary Debtors may, in their discretion, and without further order of the Bankruptcy Court, declare (i) the payment of the Payment Amount, as the case may be, is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Subsidiary Debtors may recover from the Vendor in cash or in goods (including by setoff against postpetition obligations); or (ii) the Vendor shall immediately return the Subsidiary Debtors' payment of its Payment Amount without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever, and the Critical Operating Expense Claim (as defined in the ~~Interim~~Final Critical Vendor Order) shall be reinstated in an amount that will restore the Subsidiary Debtors and the Vendor to their original positions as if the Vendor Agreement had

3

never been entered into and the payment of the Critical Operating Expense Claim had not been made;

~~g. if Vendor is later determined to be an "insider," as defined by section 101(31) of the Bankruptcy Code, and Vendor has received any Payment Amount on account of a Critical Operating Expense Claim pursuant to this Vendor Agreement, (i) Vendor shall immediately return any and all payments made on account of its Critical Operating Expense Claim without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever, and the Critical Operating Expense Claim shall be reinstated in such an amount so as to restore the Debtors and Vendor to their original positions as if no payments on account of the Critical Operating Expense Claim had been made pursuant to this Vendor Agreement; or (ii) the payment of the Critical Operating Expense Claim shall be deemed a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Subsidiary Debtors may recover in cash or in goods from such Vendor (including by setoff against postpetition obligations).~~

g.   ~~h.~~ if Vendor fails to comply with the terms and provisions of this Vendor Agreement, the Subsidiary Debtors may, in their discretion, declare that such Vendor Agreement has terminated; provided that the Vendor Agreement may be reinstated if:

   i.    after notice and a hearing (following a motion filed by the respective Vendor), the Bankruptcy Court reverses the Subsidiary Debtors' decision to terminate the Vendor Agreement for good cause shown that the Subsidiary Debtors' determination was materially incorrect;

   ii.   the Vendor fully cures the underlying default of the Vendor Agreement within five (5) business days from the date of receipt of notice of termination of the Vendor Agreement; or

   iii.  the Subsidiary Debtors, in their sole discretion, reach a commercially acceptable agreement with the breaching party;

h.   ~~i.~~ the Parties hereby submit to the exclusive jurisdiction of the Court to resolve any dispute arising under or in connection with this Vendor Agreement.

6.   Subject to the requirements of the Bankruptcy Code, further orders of the Court, or applicable law, and unless it otherwise becomes public without a breach of this Vendor

4

Agreement, Vendor agrees to hold in confidence and not disclose to any party:  (a) any and all payments made by the Subsidiary Debtors pursuant to this Vendor Agreement; (b) the terms of payment set forth herein; and (c) the Customary Trade Terms (collectively, the "**Confidential Information**"); provided that if any party seeks to compel Vendor's disclosure of any or all of the Confidential Information, through judicial action or otherwise, or Vendor intends to disclose any or all of the Confidential Information, Vendor shall immediately provide the Subsidiary Debtors with prompt written notice so that the Subsidiary Debtors may seek an injunction, protective order or any other available remedy to prevent such disclosure; provided, further, that if such remedy is not obtained, Vendor shall furnish only such information as Vendor is legally required to provide.

7.       The undersigned hereby represent and warrant that:  (a) they have full authority to execute this Vendor Agreement on behalf of the respective Parties; (b) the respective Parties have full knowledge of, and have consented to, this Vendor Agreement; and (c) they are fully authorized to bind the Party to all of the terms and conditions of this Vendor Agreement.

8.       This Vendor Agreement sets forth the entire understanding of the Parties regarding the subject matter hereof and supersedes all prior oral or written agreements between them.  This Vendor Agreement may not be changed, modified, amended or supplemented, except in a writing signed by both Parties.

5

9.       This Vendor Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement. Signatures by facsimile or electronic signatures shall count as original signatures for all purposes.

AGREED AND ACCEPTED AS OF THE DATE SET FORTH ABOVE:

**[SUBSIDIARY DEBTOR]**                    **[VENDOR]**

_____          _____

6

| Summary report: Litera® Change-Pro for Word 10.8.2.11 Document comparison done on 10/22/2021 5:26:28 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** AYH - Revised Proposed Order for Critical Vendor Motion.docx | |
| **Modified filename:** AYH - Proposed Order for Management Vendor Motion_WEIL_98152483_6.DOCX | |
| **Changes:** | |
| Add | 53 |
| Delete | 59 |
| Move From | 3 |
| Move To | 3 |
| Table Insert | 2 |
| Table Delete | 1 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 121 |