WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Jacqueline Marcus
Matthew P. Goren

*Attorneys for the Initial Debtor and*
*Proposed Attorneys for the Subsidiary Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
:
**In re**                                                       :    Chapter 11
:
**EVERGREEN GARDENS MEZZ LLC,** *et al.*,   :    Case No. 21-10335 (MG)
:
Debtors.[1]                                               :    (Jointly Administered)
:
:
------------------------------------------------------------X

## DECLARATION OF
## ASSAF RAVID IN SUPPORT OF CONFIRMATION OF
## AMENDED JOINT CHAPTER 11 PLAN OF EVERGREEN GARDENS 1 LLC, EVERGREEN GARDENS II LLC, AND EVERGREEN GARDENS MEZZ LLC

I, Assaf Ravid, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1. On March 4, 2021, I was retained as the Chief Executive Officer ("**CEO**") and Chief Restructuring Officer ("**CRO**") of All Year Holdings Limited ("**All Year Holdings**" and, together with its direct and indirect subsidiaries, collectively "**All Year**"), a company

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Evergreen Gardens Mezz LLC (0416); Evergreen Gardens I LLC (2211); and Evergreen Gardens II LLC (6782). The Debtors' principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211.

organized as a BVI Business Company under the laws of the British Virgin Islands. Among All Year Holdings' direct and indirect subsidiaries are Evergreen Gardens Mezz LLC (the "**Initial Debtor**" or "**EGM**"), Evergreen Gardens I LLC ("**EG I**"), and Evergreen Gardens II LLC ("**EG II**" and, together with EG I, the "**Subsidiary Debtors**" and, together with the Initial Debtor, the "**Debtors**"). I am knowledgeable and familiar with the Debtors' businesses and financial affairs.

2.      Prior to my current position at All Year Holdings, I served as an official representative of All Year Holdings' Series B, C, D, and E bondholders. Before this position, I was the managing director of CGI Strategies ("**CGI**"), a domestic development real estate company focused on developing and operating multi-family units, condominiums, and commercial properties in California, the Southeast, and the Northeast. In this capacity, I managed the operations of CGI's New York office by overseeing the full real estate development cycle from acquisitions, construction, sales and marketing, and financing and refinancing. Prior to this role, from 2007–2012, I served as a managing director of Aura Investments, Ltd, a global investment company specializing in real estate development and property management. Before that I was a co-founder and attorney of Raveh-Ravid & Co., a leading Israeli law firm specializing in real estate and commercial law.

3.      I submit this declaration (the "**Declaration**") in support of the Debtors' request for entry of the proposed order (the "**Proposed Confirmation Order**") (i) approving the Debtors' (a) *Disclosure Statement for Joint Chapter 11 Plan of Evergreen Gardens I LLC, Evergreen Gardens II LLC, and Evergreen Gardens Mezz LLC* (ECF No. 71) (as the same may be amended, modified, supplemented, or restated, and together with all schedules and exhibits thereto, the "**Disclosure Statement**"), pursuant to section sections 1125 and 1126(b) of title 11 of the

United States Code (the "**Bankruptcy Code**"); (b) solicitation of votes and voting procedures (the "**Solicitation Procedures**"); and (c) the forms of ballot (the "**Ballots**"); and (ii) pursuant to section 1129 of the Bankruptcy Code, confirming the *Joint Chapter 11 Plan of Evergreen Gardens I LLC, Evergreen Gardens II LLC, and Evergreen Gardens Mezz LLC*, dated September 13, 2021 [ECF No. 70] (as modified and amended on October 28, 2021 [ECF No. 187], and as may be further amended, modified, supplemented, or restated, and together with all schedules and exhibits thereto, the "**Plan**"), including the Plan Supplement, dated October 11, 2021 [ECF No. 141] and the Second Plan Supplement, dated October 18, 2021 [ECF No. 161] (collectively, as may be amended, modified, supplemented, or restated, the "**Plan Supplement**").[2]  I have reviewed, and I am generally familiar with, the terms and provisions of the Plan, the documents comprising the Plan Supplement, the Disclosure Statement, and the requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code.  I was personally involved in the development of and negotiations regarding the Plan and its related documents.

4. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of All Year working under my supervision, information provided to me by the Debtors' professional advisors working under my direction, or my opinion based upon experience, knowledge, and information concerning the Debtors.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the *Debtors' Memorandum of Law in Support of (I) Approval of (A) Disclosure Statement, (B) Procedures for the Solicitation and Tabulation of Votes, and (C) Forms of Ballots and Related Notices, and (II) Confirmation of Amended Joint Chapter 11 Plan of Evergreen Gardens I LLC, Evergreen Gardens II LLC, and Evergreen Gardens Mezz LLC*, filed contemporaneously herewith.

5.  I previously submitted a declaration, pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York, in support of the Subsidiary Debtors' chapter 11 petitions and related relief, dated September 14, 2021 [ECF No. 3 on the EG I and EG II docket] (the "**First Day Declaration**"), which is incorporated herein by reference.

### The Plan Satisfies Section 1129 of the Bankruptcy Code

6.  On the basis of my understanding of the Plan, the events that have occurred prior to and during the Debtors' Chapter 11 Cases, and discussions I have had with the Debtors' legal counsel regarding various orders entered during these Chapter 11 Cases and the requirements of the Bankruptcy Code, I believe that the Plan satisfies all of the applicable requirements of section 1129(a) of the Bankruptcy Code as described in this Declaration.[3]

7.  Bankruptcy Code Section 1129(a)(1). On the basis of my understanding of the Bankruptcy Code, I believe that the Plan complies with section 1129(a)(1) of the Bankruptcy Code because the Plan complies with sections 1122 and 1123 of the Bankruptcy Code.

8.  Bankruptcy Code Section 1122. The Plan designates the classification of Claims and Interests. The Plan provides for the separate classification of Claims against and Interests in each Debtor based upon the differences in legal nature and/or priority of such Claims and Interests. In total, the Plan designates sixteen (16) Classes of Claims and Interests in the Debtors as follows:[4]

---

[3] It is my understanding, based on conversations with counsel, that sections 1129(a)(6) and 1129(a)(13) through 1129(a)(16) of the Bankruptcy Code are inapplicable to the Debtors.

[4] Administrative Expense Claims, Fee Claims, DIP Claims, and Priority Tax Claims have not been classified.

**EG I**:

    i.    <u>Class 1 (Priority Non-Tax Claims)</u>: Claims against EG I entitled to priority in payments under section 507(a) of the Bankruptcy Code, other than Administrative Expense Claims and Priority Tax Claims.

    ii.    <u>Class 2 (JPM Secured Claims)</u>: Claims arising under or relating to the EG I Mortgage Loan Agreement.

    iii.    <u>Class 3 (Other Secured Claims)</u>: Any Secured Claim against EG I other than a DIP Claim, a Priority Tax Claim, a JPM Secured Claim, the Mezzanine Loan Claim, or a Series E Secured Claim.

    iv.    <u>Class 4 (General Unsecured Claims)</u>: Claims against EG I which include trade payables and other general unsecured obligations, other than mechanics' and materialmen's claims.

    v.    <u>Class 5 (Intercompany Claims)</u>: Claims against EG I for amounts owed to other Debtor and non-Debtor affiliates.

    vi.    <u>Class 6 (Equity Interests)</u>: Any Interests in EG I.

**EG II**:

    vii.    <u>Class 1 (Priority Non-Tax Claims)</u>: Claims against EG II entitled to priority in payments under section 507(a) of the Bankruptcy Code, other than Administrative Expense Claims and Priority Tax Claims.

    viii.    <u>Class 2 (Series E Secured Claims)</u>: Claims against EG II pursuant to the Series E Deed of Trust.

    ix.    <u>Class 3 (Other Secured Claims)</u>: Any Secured Claim against EG II other than a DIP Claim, a Priority Tax Claim, a JPM Secured Claim, the Mezzanine Loan Claim, or a Series E Secured Claim.

    x.    <u>Class 4 (Convenience Claims)</u>: Claims against EG II, which are otherwise General Unsecured Claims and that are less than $10,000 or have been reduced to $10,000 by the holders of such claims.

    xi.    <u>Class 5 (General Unsecured Claims)</u>: Claims against EG II which include trade payables, mechanics' and materialmen's claims, as well as the unsecured deficiency claims of the Series E Noteholders.

    xii.    <u>Class 6 (Intercompany Claims)</u>: Claims against EG II for amounts owed to other Debtor and non-Debtor affiliates.

    xiii.    <u>Class 7 (Equity Interests)</u>: Equity Interests in EG II.

**EGM**:

    xiv.    <u>Class 1 (Priority Non-Tax Claims)</u>: Claims against EGM entitled to priority in payments under section 507(a) of the Bankruptcy Code, other than Administrative Expense Claims and Priority Tax Claims.

    xv.    <u>Class 2 (Mezzanine Loan Claim)</u>: Any Claim against EGM of the Mezzanine Lender arising under or relating to the Mezzanine Loan.

    xvi.    <u>Class 3 (Equity Interests)</u>: Equity Interests in EGM.

9. Each Class contains only Claims or Interests that are substantially similar to one another. I understand that the Plan bifurcates the claims of the Series E Noteholders into the Series E Secured Claims and the Series E Notes Deficiency Claims. The Series E Secured Claims represent the share of proceeds of the Sale Transaction that is attributable to the Denizen Y. The Series E Notes Deficiency Claims represents the Series E Claims less the amount of the Series E Secured Claim Distribution provided under the Plan. Given that there will be insufficient funds to pay the Series E Noteholders Claims in full, and they are senior in priority to the claims of any mechanic's and materialmen's lienholders asserted against EG II, such mechanic's and materialmen's claims are unsecured. Based on my understanding, I believe that the Plan incorporates a classification and distribution scheme that adheres to the statutory priorities prescribed by the Bankruptcy Code. The classification scheme was not proposed to create a consenting impaired Class or to manipulate voting.

10. <u>Bankruptcy Code Section 1123(a)(1) (Designation of Classes of Interests)</u>. The Plan designates sixteen (16) Classes of Claims and Classes of Interests against the Debtors.

11. <u>Bankruptcy Code Section 1123(a)(2) and (a)(3) (Specify Unimpaired and Impaired)</u>. The Plan specifies whether each Class of Claims or Interests is Impaired or Unimpaired under the Plan and the treatment of each such Class.

6

12. <u>Bankruptcy Code Section 1123(a)(4) (Same Treatment Within Classes)</u>. The Plan provides that, except as otherwise agreed to by a holder of a particular Claim or Interest, the treatment of each Claim or Interest in each Class is the same as the treatment of each other Claim or Interest in such Class. With respect to Class 4 (Convenience Claims at EG II), the holders of such Claims have Claims worth less than $10,000, or have elected to have their claims reduced to $10,000. Class 4 (Convenience Claims at EG II) are to be paid in full to allow for claims of smaller value to be efficiently paid and distributed for the purpose of administrative convenience.

13. <u>Bankruptcy Code Section 1123(a)(5) (Adequate Means for Plan Implementation)</u>. I believe the Plan provides adequate means for its implementation through, among other things: (a) the Sale to the Purchaser pursuant to the Purchase Agreement; (b) the provisions governing distributions under the Plan, including without limitation, the Sale Transaction Allocation Proportion; (c) the wind down and dissolution of the Debtors; (d) the issuance of equity in Post-Effective Date EGM and EG II to the applicable Plan Administrators; (e) the appointment of the Plan Administrators; and (f) authorization for all actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case, in accordance with and subject to the terms of the Plan.

14. <u>Bankruptcy Code Section 1123(a)(6) (Provide for the Inclusion in the Charter of the Debtor of a Provision Prohibiting Issuance of Nonvoting Equity Securities)</u>. The Second Plan Supplement contains the organizational documents for Post-Effective Date EGM and Post-Effective Date EG II, each of which, I understand, prohibits the issuance of nonvoting equity securities.

15. <u>Bankruptcy Code Section 1123(a)(7) (Selection of Officers and Trustees in a Manner Consistent with the Interests of Creditors and Equity Security Holders)</u>. The Plan

Administrator for EGM was selected by the Mezzanine Lender and the Plan Administrator for EG II was selected by the Series E Notes Trustee, each of which are the creditors with the greatest interests in the proceeds of the Avoidance Actions and other Causes of Action for the respective Post-Effective Debtors.  Accordingly, I believe that the Plan provisions governing the manner of selection of each Plan Administrator are consistent with the interests of creditors and equity security holders and with public policy.

16. <u>Bankruptcy Code Section 1123(b)(1) (Impair or Leave Unimpaired any Class or Claims or Interests)</u>.  Article IV of the Plan describes the treatment for each of the Unimpaired Classes and the Impaired Classes for each of the Debtors.

17. <u>Bankruptcy Code Section 1123(b)(2) (Treatment of Executory Contracts or Unexpired Leases)</u>.  With respect to the Subsidiary Debtors' executory contracts and unexpired leases, I understand that Section 10.1 of the Plan provides that all executory contracts and unexpired leases to which either of the Subsidiary Debtors is a party shall be deemed rejected, unless such contract or lease (i) was previously assumed or rejected by the Subsidiary Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Subsidiary Debtors on or before the Confirmation Date; (iv) is identified in Section 10.4 of the Plan; or (v) is a Tenant Lease identified on the Assumption Schedule included in the Plan Supplement.

18. <u>Bankruptcy Code Section 1123(b)(3)(A) and (B) (Retention of Claims and Interests)</u>.  I understand that the Plan provides for the retention of Avoidance Actions and other Causes of Action by the Post-Effective Debtors. The Avoidance Actions and other Causes of

Action will be pursued by the applicable Plan Administrator for the benefit of the creditors of Post-Effective Date EG II or Post-Effective Date EGM, as applicable.

19. <u>Bankruptcy Code Section 1123(b)(4) (Provide for the Sale of Estate Property)</u>. The Plan provides for the sale of substantially all of the property of the Subsidiary Debtors' estates to the Purchaser and sets forth the allocation and distribution of EG I Sale Proceeds and EG II Sale Proceeds in accordance with the Plan and the RSA.

20. <u>Bankruptcy Code Section 1123(b)(5) (Modify or Leave Unaffected Rights of Holders of Secured and Unsecured Claims)</u>. I understand that the Plan modifies the rights of holders of Claims in each of the Voting Classes and the Deemed to Reject Classes and leaves unaffected the rights of holders of Claims and Interests in each the Unimpaired Classes for each of the Debtors.

21. <u>Bankruptcy Code Section 1123(b)(6) (Appropriate Provisions Not Inconsistent with the Bankruptcy Code)</u>. I understand that the Plan (a) contains certain release and exculpation provisions, and (b) provides that the Court will retain jurisdiction over all matters arising in and related to these Chapter 11 Cases.

22. <u>Release Provisions</u>. The Plan provides for the release of certain Claims and Causes of Action held by (i) the Debtors and their Estates, and the Post-Effective Debtors, on behalf of themselves and their respective successors, assigns, and representatives (the "**Estate Releases**"), and (ii) the holders of Claims who vote to accept the Plan, the Series E Notes Trustee, the Mezzanine Lender, the DIP Lender, each of the other Released Parties (other than the Post-Effective Debtors), and, with respect to the foregoing entities, their respective predecessors, successors, and assigns, subsidiaries and affiliates, and all Persons entitled to assert Claims on their behalf with respect to the matters to which the releases pertain (the "**Third Party Releases**"

and, together with the Estate Releases, the "**Plan Releases**"). Based on my participation in negotiations regarding the Plan, I believe that the Plan Releases are integral components of the Plan, appropriate and necessary under the circumstances, and are being provided in exchange for fair consideration.

23. <u>Estate Releases</u>. Section 12.6(a) of the Plan contains a release of certain claims or Causes of Action of the Debtors and their successors against the Released Parties (other than the Post-Effective Debtors). The Estate Releases do not (i) release any claims or Causes of Action arising after the Effective Date against any party or (ii) affect the rights of the Debtors or their successors under the Plan to enforce the terms of the Plan or the Definitive Documents, or the ability of the Plan Administrators to pursue EG I and EGM Retained Causes of Action or EG II Retained Causes of Action. Although I am not aware of any claims or causes of action against the Released Parties, each of the Released Parties (other than the Post-Effective Date Debtors) insisted upon an Estate Release as part of the negotiations surrounding the Plan, the RSA, the Sale Transaction, and the Definitive Documents. Claims against the BVI Parent and its Related Entities (other than the Debtors), including, without limitation, the Goldman Guaranty Claims, are not released under the Plan. Without the support and cooperation of the Released Parties, I do not believe that the Debtors would have been able to secure a bid for the Denizen in an amount as high as the $506 million submitted by the Purchaser, which inures to the benefit of all creditors. Further, I believe that the Released Parties' cooperation and willingness to negotiate to reach a consensual deal for the Chapter 11 Cases permitted the Debtors to avoid spending considerable time and money engaged in costly, lengthy, and uncertain litigation which would have extended the duration of the Chapter 11 Cases, thereby substantially reducing creditor recoveries. As additional consideration for the Estate Releases, I understand that the Debtors will receive reciprocal releases

from any Causes of Action. Moreover, the Plan Administrators will have authority to pursue all Avoidance Actions and other Causes of Action, including without limitation the Goldman Guaranty Claims, for the benefit of the respective estates. For these reasons, I believe that the Estate Releases are fair, reasonable, appropriate, necessary, and integral components of the Plan.

24. <u>Third Party Releases</u>. Section 12.6(b) of the Plan contains consensual releases by the following parties (collectively, the "**Releasing Parties**") against the Released Parties (other than the Post-Effective Debtors) for liability relating to the Debtors and these chapter 11 cases: (i) the holders of Claims who vote to accept the Plan; (ii) the Series E Notes Trustee; (iii) the Mezzanine Lender; (iv) the DIP Lender; (v) each of the other Released Parties; and (vi) with respect to any Entity in the foregoing clauses (i) through (v), such Entity's (x) predecessors, successors, and assigns (y) subsidiaries, affiliates, managed accounts or funds, managed or controlled by such Entity and (z) all Persons entitled to assert Claims through or on behalf of such Entities with respect to the matters for which the releasing entities are providing releases. The Third Party Releases do not apply to any creditors who vote to reject the Plan, creditors or interest holders in the Non-Voting Classes, or claimants that abstain or refrain from voting to accept or reject the Plan. Accordingly, I believe that the Third Party Releases are consensual and appropriately limited in scope.

25. <u>Exculpation</u>. Section 12.7 of the Plan contains an exculpation for certain Exculpated Parties for claims arising out of conduct occurring after the Subsidiary Debtor Petition Date. The exculpation provision carves out acts or omissions that are determined by a Final Order to have constituted gross negligence, fraud, or willful misconduct. I am informed that the exculpation contained in the Plan is customary. Inclusion of the exculpation provision was necessary to achieve, among other things, the consensus and settlements embodied in the Plan by

11

and among the Debtors and the Series E Notes Trustee, JPM, the Mezzanine Lender, the Purchaser, and, in each case, all Related Parties who worked on their behalf. Based on my participation in Plan negotiations, I believe that the protection provided by the exculpation provision promoted and fostered the good faith negotiations that culminated in overwhelming support for the Plan among economic stakeholders.

26. In sum, I believe that the Plan Releases and exculpation provision contained in the Plan (i) were given in exchange for good and valuable consideration; (ii) were integral to the agreements among the various parties in interest and are essential to the formulation and implementation of the Plan; (iii) confer substantial benefits on the Debtors' Estates; (iv) are fair, equitable and reasonable; (v) are in the best interests of the Debtors, their Estates, and parties in interest; and (vi) the failure to implement the Plan Releases and exculpation provisions contained in the Plan would seriously impair the Debtors' ability to confirm the Plan.

27. <u>Bankruptcy Code Section 1129(a)(2)</u>. It is my understanding that the Debtors have complied with the applicable provisions of title 11, including the provisions of sections 1125 and 1126 regarding Solicitation and the Disclosure Statement. Under my supervision and with the assistance of their professional advisors, the Debtors have also complied with all of the requirements of the Scheduling Order, including, without limitation, with respect to service of the Combined Notice upon the Master Service List, publication of the Publication Notice in *The New York Times* and in *Haaretz*, solicitation of votes to accept or reject the Plan from creditors in the Subsidiary Debtors' Voting Classes prior to the commencement of the Subsidiary Debtors' Chapter 11 Cases, and solicitation of the vote of the Mezzanine Lender following conditional approval of the Disclosure Statement.

28. <u>Bankruptcy Code Section 1129(a)(3)</u>. I understand that section 1129(a)(3) of the Bankruptcy Code requires that a plan be proposed in good faith and not by any means forbidden by law. Prior to the Subsidiary Debtor Petition Date, the Debtors, with the assistance of Meridian, engaged in a robust and comprehensive marketing and sale process for the Denizen. Meridian, on behalf of the Debtors, devoted months to marketing the sale of the Denizen and soliciting bids from over 2,000 prospective buyers, including, but not limited to, private investors, institutions, pension funds, family offices, and REITs. The culmination of this process resulted in the Debtors' selection of the Purchaser's bid, which represented the only viable and actionable bid from a credible purchaser capable of consummating an efficient and timely sale transaction for the Denizen at a purchase price that the Debtors believed to be fair and reasonable. Accordingly, having adequately tested the market for a sale transaction for the Denizen, the Debtors determined, in the exercise of their sound business judgement, that the best opportunity to consummate a value-maximizing transaction was to proceed with the Sale to the Purchaser pursuant to the Purchase Agreement and the Plan.

29. The Debtors, the Series E Noteholders, and the Mezzanine Lender engaged in extensive good faith negotiations that ultimately culminated in the execution of the RSA and the Purchase Agreement, the commencement of the Chapter 11 Cases, and the agreement of various constituencies on terms of the Plan pursuant to which the Sale will be consummated. These negotiations spanned approximately five months and included many hours of review and due diligence conducted by sophisticated counsel and professionals. For these reasons, I believe that the Plan was proposed in good faith and is the product of arms' length negotiations.

30. <u>Bankruptcy Code Section 1129(a)(4)</u>. I understand that section 1129(a)(4) of the Bankruptcy Code requires that all payments of professional fees which are made from estate

assets be subject to review and approval as to their reasonableness by the court. It is my understanding that all payments for services provided to the Debtors during the Chapter 11 Cases must be approved by the Court as reasonable and the Plan satisfies this requirement.

31. <u>Bankruptcy Code Section 1129(a)(5)</u>. I understand that section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a successor to a debtor under the plan and that such appointment be consistent with the interests of creditors and equity security holders and with public policy. In the First Plan Supplement, the Debtors disclosed the identity of the Plan Administrators, provided a short biography of each Plan Administrator, and included a substantially final draft of each proposed Plan Administration Agreement. No insiders will be retained or employed by Post-Effective Date EGM or Post-Effective Date EG II.

32. <u>Bankruptcy Code Section 1129(a)(7)</u>. I understand that the Bankruptcy Code requires that, with respect to each impaired Class of Claims and Interests, each holder of a claim or equity interest must either (a) accept the Plan or (b) receive or retain under the Plan property having a present value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. I have reviewed the Liquidation Analysis, which was included as Exhibit D to the Disclosure Statement and is incorporated herein by reference. Based on this review, I believe that the Liquidation Analysis demonstrates that the requirements of section 1129(a)(7) are satisfied as to every single holder of a Claim or Interest in each of the Impaired Classes, including the Deemed to Reject Classes, since these classes will at least receive as much under the Plan as they would receive if these Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code. Accordingly, I believe that the holders of such Claims or Interests are receiving or retaining

under the Plan the maximum recovery to which they are entitled and, as a result, could not receive greater recovery under chapter 7.

33.     <u>Bankruptcy Code Section 1129(a)(8)</u>.  I understand that, as to each Debtor, as applicable, the Plan has been overwhelmingly accepted by creditors in each of the Voting Classes. Thus, as to such Classes, I believe that the requirements of section 1129(a)(8) of the Bankruptcy Code have been satisfied.  Additionally, it is my understanding that the holders of Claims and Interests in the Deemed to Reject Classes are deemed to have rejected the plan pursuant to section 1126(g) of the Bankruptcy Code.  Based on my understanding of the Bankruptcy Code, as to these Classes, the Plan may be confirmed over their dissent under the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

34.     <u>Bankruptcy Code Section 1129(a)(9)</u>.  The Plan provides that, unless a holder agrees to less favorable treatment, holders of Allowed Administrative Expense Claims under section 503(b) of the Bankruptcy Code will be paid in full, in Cash, on the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim. Further, the Plan provides that, unless a holder agrees to less favorable treatment, holders of Allowed Priority Non-Tax Claims under section 507(a) of the Bankruptcy Code (excluding Priority Tax Claims under section 507(a)(8), as described herein) will (i) be paid in full, in Cash, on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable; or (ii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired.  Moreover, the Plan provides that unless a holder agrees to less favorable treatment, holders of Allowed Priority Tax Claims (i) will

15

be paid Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is Allowed on the Effective Date, (b) the first business day after the date that is thirty (30) calendar days after the date such Claim becomes Allowed, and (c) the date such Claim is due and payable in the ordinary course as such obligation becomes due; or (ii) will receive equal annual Cash payments in an aggregate amount equal to the amount of such Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Petition Date. Accordingly, based on my understanding of the Bankruptcy Code, I believe that the Plan satisfies the requirements of section 1129(a)(9)(A), (B), and (C) of the Bankruptcy Code.

35. <u>Bankruptcy Code Section 1129(a)(10)</u>. The only Debtors with Impaired Classes are EGM and EG II. Each of the Impaired Classes entitled to vote on the Plan—Class 2 (Mezzanine Loan Claim) at EGM and Class 2 (Series E Secured Claims) and Class 5 (General Unsecured Claims) at EG II—has voted to accept the Plan, without including the acceptance of the Plan by any insiders in such Class. EG I does not have any impaired classes of claims. Accordingly, I believe that the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

36. <u>Bankruptcy Code Section 1129(a)(11)</u>. I understand that section 1129(a)(11) of the Bankruptcy Code requires that the Court determine that the Plan is feasible as a condition precedent to confirmation. The Plan is premised upon the closing of the Sale Transaction. I believe that the Sale Transaction has a strong likelihood of closing because the Debtors, the Purchaser, the Series E Noteholders, and the Mezzanine Lender have committed to consummating the Sale Transaction pursuant to the Purchase Agreement and RSA, as applicable, and have expended significant time and resources in connection therewith. Further, in selecting the Purchaser's bid, the Debtors, in consultation with Meridian, evaluated the Purchaser's ability

to close the Sale Transaction and determined that the Purchaser was capable of and willing to do so. Moreover, the Purchaser has already furnished $20 million good faith deposit pursuant to the Purchase Agreement.

37. To consummate the Sale Transaction, the Subsidiary Debtors will sell the Properties to the Purchaser in accordance with the Purchase Agreement in exchange for the Purchase Price of $506 million. Upon consummation of the Sale, EG I and EG II will receive the EG I Sale Proceeds and the EG II Sale Proceeds, respectively. The EG I Sale Proceeds and the EG II Sale Proceeds will be used to, among other things, pay the DIP Claims in full and to make the distributions to holders of Allowed Claims and Interests as provided in the Plan. The Plan also sets forth certain Cash payments that the Debtors and/or the Plan Administrator will make on or after the Effective Date, including, among others, payments to holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims. Further, the Plan provides for the establishment of the EG I Disputed Claims Reserve for the benefit of holders of Disputed Claims against EG I.

38. In connection with the development of the Plan, the Debtors, with the assistance of their professional advisors, thoroughly analyzed their ability to fulfill their obligations thereunder. As part of this analysis, the Debtors considered the estimated costs of administering and consummating the Plan, including the costs for the Plan Administrator to liquidate the Debtors' remaining assets and the Cash payments that the Debtors and/or the Plan Administrator will make on or after the Effective Date. Based on this analysis, the Debtors concluded that the $506 million in proceeds from the closing of the Sale Transaction will provide more than sufficient funds to fulfill their obligations under the Plan.

39. Based on the foregoing, I believe that the Plan embodies a rational plan for consummating the Sale Transaction pursuant to the Purchase Agreement and the delivery of distributions to holders of Allowed Claims following the Effective Date through the allocation of the proceeds of the Sale in accordance with the Plan and RSA. Therefore, it is my belief that the Plan is feasible and satisfies section 1129(a)(11) of the Bankruptcy Code.

40. <u>Bankruptcy Code Section 1129(a)(12)</u>. The Plan provides for the payment of statutory fees, together with interest (if any), pursuant to section 3717 of title 31 of the United States Code on the Effective Date and thereafter as may be required. The Wind Down Budgets for Post-Effective Date EGM and Post-Effective Date EG II included in the Plan Supplements reflect that the Debtors have made adequate provision for payment of the fees of the U.S. Trustee.

41. <u>Bankruptcy Code Section 1129(b)</u>. Based on my understanding of the Bankruptcy Code, I believe that the Plan satisfies the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. As each of the Voting Classes has voted to accept the Plan, "cram down" is only relevant here with respect to the Deemed to Reject Classes (*i.e.*, Class 6 (Intercompany Claims at EG II), Class 7 (Equity Interests at EG II), and Class 3 (Equity Interests at EGM)). I understand that the Plan may be confirmed as to each of these Classes pursuant to the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

42. I believe that the Plan does not "discriminate unfairly" (or at all) with respect to holders of Class 6 (Intercompany Claims at EG II), Class 7 (Equity Interests at EG II), and Class 3 (Equity Interests at EGM) because the Claims and Interests in each such Class are legally distinct in their respective legal nature from Claims and Interests in all other Classes. All similarly situated Claims and Interests will receive substantially similar treatment under the Plan. Additionally, I believe that the "fair and equitable" rule is satisfied as to the holders of Claims and

Interests in Class 6 (Intercompany Claims at EG II), Class 7 (Equity Interests at EG II), and Class 3 (Equity Interests at EGM) as no holder of claims or interests junior to any such classes will receive or retain any property under the Plan on account of such junior claims or interests. Further, no senior creditor will receive more than a 100 percent recovery under the Plan. Based on the foregoing, I believe that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code as to each of the Deemed to Reject Classes and may be confirmed despite the deemed rejection by such Classes.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

By: _____
Name:  Assaf Ravid
Title:    Authorized Signatory for the Debtors

[Signature Page to Ravid Declaration]